HONORABLE JAMES L. ROBART

1

2

3

4

5

6

7

8

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT TACOMA

9

ERIC DODGE, an individual,

Case No. 3:20-cv-05224-JLR

10

    Plaintiff,

11

    vs.

**PLAINTIFF'S OPPOSITION TO
DEFENDANTS' MOTIONS FOR
SUMMARY JUDGMENT**

12

13

14

EVERGREEN SCHOOL DISTRICT NO. 114,
a public corporation; CAROLINE GARRETT,
an individual; and JANAE GOMES, an
individual,

Noted for Consideration:
December 4, 2020

Without Oral Argument

15

    Defendants.

16

## I.    INTRODUCTION

17

    Motions for summary judgment have been filed by Evergreen School District No. 114

18

and Janae Gomes on the one hand [Dkt. #36] and Caroline Garrett on the other [Dkt. #39], but

19

the motions are based on identical grounds and so will be responded to together.

20

    Regarding plaintiff's First Amendment retaliation claim under §1983, defendants seek

21

summary judgment on a narrow and specific ground: that plaintiff, by his own admission, did not

22

subjectively intend his "Make America Great Again" (MAGA) hat to be "expressive conduct".

23

This argument is misguided for two reasons: (1) defendants apply the wrong legal standard

24

because the MAGA hat was "pure speech"; and (2) defendants mischaracterize plaintiff's

25

testimony on his rationale for wearing the hat.  As a result, defendants' specific legal challenge

26

Page 1 – **PLAINTIFF'S OPPOSITION TO
DEFENDANTS' MOTIONS FOR SUMMARY
JUDGMENT - 3:20-cv-05224-JLR**
02127049.DOCX

LINDSAY HART, LLP
1300 SW FIFTH AVENUE, SUITE 3400
PORTLAND, OREGON 97201-5640
PHONE: 503-226-7677 FAX: 503-226-7697

to the First Amendment retaliation claim fails, and defendants have not raised any challenges to any other element of that claim.

Regarding defendants' challenges to plaintiff's alternative substantive due process claim under §1983 and his pendent state-law claim for the tort of outrage, these challenges should be rejected because genuine issues of material fact exist to prevent judgment as a matter of law. Alternatively, these challenges should be denied or deferred under Rule 56(d) of the Federal Rules of Civil Procedure given that discovery is still in the early stages.

## II.      FACTUAL BACKGROUND

### A.      Plaintiff's Complaint

Plaintiff Eric Dodge's allegations are set forth in detail in his First Amended Complaint [Dkt. #25]; *see also* Order on Defendants' Motion to Dismiss under Rule 12(B)(6) at Dkt. #24, p. 7 (finding plaintiff's First Amendment retaliation claim under 1983 to be adequately pled). Defendants have not challenged the bulk of these allegations for the purpose of these motions.

### B.      Plaintiff's Testimony Regarding the Wearing of His MAGA Hat

From Tuesday, August 20 to Friday, August 23, 2019, plaintiff Eric Dodge was present at his place of employment, Wy'East Middle School in Vancouver.  This was the week before classes, so students were not yet around; teachers could work this week to set up their classrooms and participate in trainings.  Each day that Dodge was at Wy'East that week, he wore his MAGA hat in the school parking lot while walking from his vehicle to the front door.  Declaration of Michael Estok ("Estok Decl."), Ex. 1 (Dodge Depo. at 72:18 – 73:1 & 74:10-14 & 77:11-19).

Dodge wore the hat for two reasons.  First, he had been advised by his dermatologist to wear a hat on sunny days to avoid skin cancer on his scalp, and the MAGA hat was essentially the only hat that he owned.  *Id.* at 74:15 – 75:17.

Second, he wore the hat because he believed in its message:

///

LINDSAY HART, LLP
1300 SW FIFTH AVENUE, SUITE 3400
PORTLAND, OREGON 97201-5640
PHONE: 503-226-7677 FAX: 503-226-7697

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

Q. Any other reasons that you wore the Make America Great Again hat the morning of August 22nd?"

A.  It was hot and sunny.  And like I said, it was my birthday.  It just felt like a good day to put a hat on and **just be proud of who I am and who we are as a country.  And so I – that was why I wore it**.

*Id.* at 75:18-23 (emphasis added); *see also id.* at 122:11-21 ("it's the same intention I have when I always wear it, which is **to show people who I am** and to cover the sunspots on my head").

The MAGA hat (seen to the right) is well known as being a campaign hat for President Trump.[1]  In his deposition, Dodge explained that one of the reasons he wears it is to show support for President Trump.  *Id.* at 82:2-4 ("The reason I had the hat with me was – you know one, one reason **because I show support for Donald Trump**") (emphasis added); *see also* Declaration of Eric Dodge, filed herewith ("Dodge Decl.") ¶2 (explaining he brought the hat to Wy'East to express support for President Trump, because he agrees with its message, and because it shows others that ordinary and normal people in the community support President Trump).



Shortly after this lawsuit was filed, a local newspaper ran an article on this lawsuit that parroted the defendants' contention that Dodge intentionally brought the hat to "training sessions prior to the beginning of school, including a first-day session on implicit bias, diversity and racial equity."  *See Former Evergreen schools teacher sues after MAGA hat dispute*, at https://www.columbian.com/news/2020/apr/28/ex-teacher-sues-after-maga-hat-dispute/ (last accessed 11/24/20).  Dodge reviewed this article at the time it was published and viewed it to be wrongly implying that he had specifically brought the MAGA hat to such a training session as some kind of protest or commentary on the subject matter of the training.  Dodge Decl. ¶3.  In fact, Dodge had no advance knowledge about the subject matter of the training session until it

---

[1] It is sold, for example, on the Trump campaign website: https://shop.donaldjtrump.com/products/official-make-america-great-again-45th-president-hat-red

LINDSAY HART, LLP
1300 SW FIFTH AVENUE, SUITE 3400
PORTLAND, OREGON 97201-5640
PHONE: 503-226-7677 FAX: 503-226-7697

started.  *Id.*; *see also* Estok Decl., <u>Ex. 1</u> (Dodge Depo at 73:18-20) ("I didn't know that there would be cultural sensitivity training at all until after – after the fact"); *see also id.* at 74:4-9 (same).

Rather, Dodge explained on that on August 22, 2019, he walked into the building, signed into the office, and "at some point, I learned we were meeting in the library, so that's where I went." *Id.* at 76:18-25.  Thus, the fact that he had the MAGA hat with him when he entered that particular training was purely incidental:

> Q.  Why did you carry your MAGA hat into that training that morning?
>
> A.  I had it in my hand for the – I guess the same reason I carried my backpack that morning.  It was with me and that's where I was going.

*Id.* at 81:7-11.

Regarding the deposition excerpts quoted in defendants' motions, all of them involved questions by defendants' counsel that were focused on Dodge's specific intent in bringing the MAGA hat **into the cultural-sensitivity training**.  *See* Dkt. #36 at pp. 5-9.  Thinking back to the misleading newspaper article, Dodge repeatedly denied having any specific intent in bringing the hat into such a training.  Dodge Decl. ¶4.  As noted, he had no advance knowledge of what the training was going to be about, and he was not using the hat as some form of protest regarding the training.  *Id.*  Dodge tried to make this distinction in his responses to defense counsel:

> Q.  Were you or did you carry the hat into the meeting to show support for Donald Trump?
>
> A.  So that's what I would – I'm a little confused at the question.  **The reason I had the hat with me was – you know, one reason because I do show support for Donald Trump; however, that wasn't the reason I brought it into the meeting.  That was just with me so I went in.**

Estok Decl., <u>Ex. 1</u> (Dodge Depo. at 81:24 – 82:6) (emphasis added).

Thus, defendants' quoted deposition questions miss the point: putting aside the issue of the training, they failed to ask Dodge the more important question of why he brought the MAGA

Page 4 – **PLAINTIFF'S OPPOSITION TO DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT - 3:20-cv-05224-JLR**
02127049.DOCX

LINDSAY HART, LLP
1300 SW FIFTH AVENUE, SUITE 3400
PORTLAND, OREGON 97201-5640
PHONE: 503-226-7677 FAX: 503-226-7697

1   hat to Wy'East generally or why he wore it in the parking lot.  As discussed above, Dodge wore

2   the hat—which is obviously "political" in nature—because he agreed with its message and even

3   viewed it as being a part of "who I am".

4   **C.     Overview of Retaliation for Wearing of a MAGA Hat**

5   Defendants have not challenged the sufficiency of facts to support any of the allegations

6   in the First Amended Complaint regarding the retaliation experienced by Dodge for wearing the

7   MAGA hat (*see id.* at ¶¶ 30-58), and so a full factual record on those events is unnecessary.

8   In terms of a general overview, Dodge's new supervisor was Wy'East's principal,

9   Caroline Garrett.  Garrett was familiar with MAGA hats and understood them to be the campaign

10  hat for President Trump.  Estok Decl., Ex. 2 (Garrett Depo. at 102:6-8).  She assumes that

11  somebody wearing a MAGA hat is a supporter of President Trump.  *Id.* at 102:17-21.

12  Garrett holds the belief that President Trump is a "fascist."  *Id.* at 89:2-8.  She further

13  believes "that somebody wearing a MAGA hat possibly has hateful feelings."  *Id.* at 103:15-17.

14  Aside from Dodge, she could not identify any known Trump supporter who worked at her

15  school.  *Id.* at 92:25 – 93:8.  She previously displayed a Bernie Sanders bumper sticker on her

16  car in the Wy'East parking lot while serving as principal.  *Id.* at 94:4-17.

17  After learning that Dodge had a MAGA hat on August 22, 2019, Garrett spoke about it

18  on the phone with Evergreen's human resources director, Janae Gomes.  *Id.* at 122:24-125:11.

19  Garrett then met with Dodge to discuss the hat.  Though she maintained a "kind of cordial"

20  attitude, Garrett told Dodge that "your hat is offensive", that some people take it "as a symbol of

21  hate and bigotry", and that "I'm not a Donald Trump supporter."  Estok Decl., Ex. 1 (Dodge

22  Depo. at 98:1-100:7 & 105:15-106:3 & 104:13-22).  She concluded the meeting by stating "I

23  can't tell you not to wear the hat" but added: "what I will say is I advise you to just use your

24  better judgment."  *Id.*  From these statements, Dodge understood that he was prohibited from

25

26  Page 5 – **PLAINTIFF'S OPPOSITION TO DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT - 3:20-cv-05224-JLR**
02127049.DOCX

LINDSAY HART, LLP
1300 SW FIFTH AVENUE, SUITE 3400
PORTLAND, OREGON 97201-5640
PHONE: 503-226-7677 FAX: 503-226-7697

1    wearing the MAGA hat at or around Wy'East.  *Id.*  After this meeting, Garrett called Gomes to

2    fill her in on what happened.  Estok Decl., Ex. 2 (Garrett Depo. at 126:4-15).

3        The next day, August 23, 2019, Dodge did not wear his MAGA hat at or around Wy'East

4    given the prior conversation with Garrett.  Estok Decl., Ex. 1 (Dodge Depo. at 113:21-114:4).

5    However, at a mid-day training he attended at Evergreen High School, Dodge wore the MAGA

6    hat while walking in its parking lot.  *Id.* at 116:6-9.  When word got back to Garrett that the hat

7    had been sighted, Garrett again discussed the issue with Gomes.  Estok Decl., Ex. 2 (Garrett

8    Depo. at 145:11-16).  According to Garrett, she consulted with Gomes multiple times throughout

9    this process, got advice on how to handle this issue, never departed from that advice, and

10   believes she did everything in accordance with Gomes's direction.  *Id.* at 153:25 – 154:17.

11       When Garrett approached Dodge later that day, she had an aggressive and confrontational

12   tone.  Estok Decl., Ex. 1 (Dodge Depo. at 136:13-142:17 & 147:1-148:11).  She began by asking

13   him: "What is the fucking deal with your hat?"  *Id.*  (As can be seen in the deposition transcript,

14   plaintiff, who is Mormon, particularly struggles with profanity and curse words.)  She then called

15   Dodge a bigot, a homophobe, a hateful person, and a liar.  *Id.*  Dodge felt he was being attacked.

16   *Id.*  Garrett threatened him that he would need union representation the next time they discussed

17   the hat.  *Id.*  She also emphasized that she never wanted him wearing the hat.  *Id.*

18       This negative encounter with his new principal had a devastating effect on Dodge.

19   Notably, as a result of his prior stroke injuries in 2017, Dodge was more susceptible to severe—

20   and even physical—reactions from anxiety and stress compared to an ordinarily healthy person.

21   Estok Decl., Ex. 3 (Nicacio Depo at 97:4-16).  After the encounter, Dodge was observed by

22   another teacher (Alicia Parkison), who saw him "shaking and stuttering" and having "an anxiety

23   attack."  Estok Decl., Ex. 4 (CRS 1052).  Dodge left Wy'East to visit his wife, who found him

24   stuttering and not talking clearly.  Estok Decl., Ex. 1 (Dodge Depo. at 148:22-149:19).  Dodge

25

26   Page 6 – **PLAINTIFF'S OPPOSITION TO DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT - 3:20-cv-05224-JLR**
02127049.DOCX

LINDSAY HART, LLP
1300 SW FIFTH AVENUE, SUITE 3400
PORTLAND, OREGON 97201-5640
PHONE: 503-226-7677 FAX: 503-226-7697

recalls losing his physical coordination and having a difficult time completing sentences due to his worsened stutter.  Dodge Decl. ¶5.

After the encounter with Dodge, Garrett spoke again with Gomes to keep her updated on what was happening.  Estok Decl., Ex. 2 (Garrett Depo. at 145:11-16).  Later that day, Dodge sent Garrett an email about the incident; though he was trying to smooth over their relationship, he also noted that he felt he was being "singled out due to my political views."  Estok Decl., Ex. 5 (EPS-6890).  Garrett did not respond to Dodge until three days later.  Id.  Gomes reviewed Garrett's response and commented to her: "Excellent response!"  Id. (EPS-6888).

Over the weekend, Dodge was told by his union representative that he would meet with HR (Gomes) to discuss the negative encounter on Monday.  Estok Decl., Ex. 1 (Dodge Depo. at 172:17-21).  When he returned to Wy'East for work on Monday, Dodge was still so distressed about the situation he had a hard time talking or walking, feeling so sick and nervous about everything.  Id. at 172:22 – 174:4.  He was stuttering and walking unsteadily (a side effect from his stroke that worsens with stress), and he was concerned about people seeing him so shaken and unsteady that he missed a training and was seen by a school nurse instead.  Estok Decl., Ex. 4 (CRS 1048).

Dodge heard back from his union rep, who stated he had met with Gomes but that Evergreen was not going to do anything about this situation, which devastated Dodge further. Estok Decl., Ex. 1 (Dodge Depo. at 176:6-178:1).  By Wednesday, Dodge could work only half a day because he felt trapped and unable to work.  Id.  He analogized it to panic attacks, stating he could not walk straight, could not focus, and could not think.  Id. at 181:5-21.  As a result, on Thursday, Dodge called in sick and went on extended medical leave.  Id. at 178:2-20.

The physician who certified that Dodge was unable to return to work, Dr. Nicacio, explained that by August 2019, Dodge had already worked a full year since having his stroke and was improving on a new medication of Ritalin.  Estok Decl., Ex. 3 (Nicacio Depo. at 92:22-

Page 7 – **PLAINTIFF'S OPPOSITION TO DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT - 3:20-cv-05224-JLR**
02127049.DOCX

LINDSAY HART, LLP
1300 SW FIFTH AVENUE, SUITE 3400
PORTLAND, OREGON 97201-5640
PHONE: 503-226-7677 FAX: 503-226-7697

93:6).  After the incident, Dodge described it to Dr. Nicacio, who upon hearing it was "shocked", adding: "I just found that hard to believe, and I was like, that's crazy", adding that the incident "affected him [Dodge] quite a bit."  *Id.* at 93:7 – 94:19.  Dodge's symptoms after the incident included increased stuttering and an inability to speak clearly, and Dr. Nicacio attributed the cause of those symptoms to the altercation with Garrett.  *Id.* at 94:25-97:10 & 99:9-24; *see also id.* at 80:20-81:24 (Dodge suffered anxiety from the incident and it prevented him from working because he has "a lower threshold to have this type of response to this verbal altercation").

Pursuant to Evergreen's policies, Dodge filed a harassment, intimidation, and bullying complaint ("HIB complaint") regarding Garrett's misconduct.  Estok Decl., Ex. 1 (Dodge Depo. at 176:6-178:1).  Through the HIB Complaint, Dodge's hope was that he would receive a fair investigation and that Evergreen would take decisive and appropriate disciplinary action against Garrett.  *Id.* at 272:12-25 & 274:11-14.

The HIB Complaint was received electronically by Evergreen's Director of School Services, but when he forwarded it to Gomes, she immediately responded that she would handle it personally because "I am already aware of Eric being disgruntled."  Estok Decl., Ex. 6.

Evergreen was required under its policies to investigate Dodge's complaint.  Declaration of Janae Gomes, Dkt. #31 at ¶4. Gomes decided to have the HIB Complaint investigated by an "outside third-party investigator", Chad Hoff, of Clear Risk Solutions, the third-party administrator for Evergreen's liability insurer.  *Id.*

Hoff interviewed Wy'East employees and then wrote up a first draft of his investigation report.  Estok Decl., Ex. 4.  One staff member (Lisa Fuller) reported that "people whose views differ from Ms. Garrett's get shut down."  *Id.* (CRS 1051).  Another staff member (Alicia Parkison) believed Dodge "was being targeted" and stated that Garrett had previously expressed in the school that "she is Anti-Trump".  *Id.* (CRS 1053).  Another employee (Joe Boken) stated that Garrett had created "a double standard in the school for staff that are of different political

Page 8 – **PLAINTIFF'S OPPOSITION TO DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT - 3:20-cv-05224-JLR**
02127049.DOCX

LINDSAY HART, LLP
1300 SW FIFTH AVENUE, SUITE 3400
PORTLAND, OREGON 97201-5640
PHONE: 503-226-7677 FAX: 503-226-7697

views that Ms. Garrett." *Id.* (CRS 1055).  As for Garrett, although she claimed to have a different recollection of the encounters than Dodge had, she admitted that (a) she told Dodge to have union representation if they were to speak about the hat again, and (b) she "told him she did not want him out there in the world representing their school with that hat." *Id.* (CRS 1057).

Based on these interviews, Hoff concluded as follows:

> The preponderance of the evidence confirmed that Mr. Dodge was singled out because he wore a 'Make American Great Again' hat.  He was **subjected to negative treatment and denied his freedom of expression** in the form of the hat, because of perceived stereotypes or political differences of opinion.  **Mr. Dodge did not violate District policy in wearing the hat.**  It was also determined that Principal Garrett has allowed other political postings and messages in the school, has not attempted to stop those postings or messages, and has participated in using/posting political statements, messages, and symbols.  Mr. Dodge kept to himself at the training, sat in the back of the room, and did not provoke or engage people about his beliefs or politics….
>
> Mr. Dodge told me that he felt intimidated and threatened during the second contact with Ms. Garrett.  He said she called him a racist, bigot, homophobic, and hateful based solely on his wearing the hat.  Ms. Garrett acknowledged that she became impatient and she admitted that she told Mr. Dodge that if they needed to discuss the hat again, he would need union representation.  **This was reasonably perceived by Mr. Dodge as a threat of discipline**…  Witnesses indicated that he was clearly shaken and upset and ultimately missed part of the training and had to be seen by the school nurse….  **This conversation with Ms. Garrett did have a substantial negative affect on Mr. Dodge**, causing him to miss part of the training he was supposed to attend.

*Id.* (CRS 1059) (emphasis added).

After Gomes viewed this draft report, however, subsequent communications caused Hoff to revise his report to remove many of the above findings that supported Dodge's complaint or that reflected poorly on Garrett or Evergreen.  *See* Estok Decl., <u>Ex. 7</u> (communications with Gomes after first draft) & <u>Ex. 8</u> (final report).  In the meantime, Gomes called Dodge to try to blackmail him into dropping his HIB Complaint prior to the conclusion of the investigation, threatening him that she would be forced to release his personal and sensitive information

Page 9 – **PLAINTIFF'S OPPOSITION TO DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT - 3:20-cv-05224-JLR**
02127049.DOCX

LINDSAY HART, LLP
1300 SW FIFTH AVENUE, SUITE 3400
PORTLAND, OREGON 97201-5640
PHONE: 503-226-7677 FAX: 503-226-7697

1   (including medical records) to a local newspaper in response to a records request if he did not

2   rescind his HIB Complaint. Estok Decl., Ex. 1 (Dodge Depo. at 289:3 to 291:14). When he was

3   so threatened, Dodge couldn't sleep due to his distress. *Id.* Ultimately, Dodge responded to

4   Gomes that he was refusing to drop his HIB Complaint. Dodge Decl., Ex. 1.

5       On October 1, 2019, Gomes then sent to Dodge a letter entitled "District Investigation

6   Response" regarding the HIB Complaint. Dodge Decl., Ex. 2. Gomes did not provide Dodge

7   with a copy of the Hoff report, but she described it as concluding that "an act of discrimination,

8   harassment, intimidation and bullying **did not occur**." *Id.* (emphasis added). She further

9   indicated that the investigator found by a "preponderance of evidence" that "multiple staff

10  members voiced their concerns and feelings of being uncomfortable" about Dodge's MAGA hat,

11  thereby implying that Hoff had found that Dodge had engaged in some kind of misconduct, even

12  though no complaint had been filed against Dodge and even though none of the Hoff reports

13  contained this finding. *Id.*

14      Under Evergreen's policies, Dodge then appealed this HR determination on the HIB

15  Complaint, and an appeal hearing before the Board was held on November 14, 2019. Dodge

16  Decl. ¶8. Dodge presented a detailed overview of what had occurred thus far to the Board. *Id.*,

17  Ex. 3. Four days later, Dodge received a letter from Evergreen, stating that it "does not find any

18  violations under policy or procedure", and so the matter was deemed closed. *Id.*, Ex. 4.

19      Given this inaction from Evergreen, according to Dodge, the situation "became more and

20  more devastating for me. The way that the district was handling it was actually making it

21  worse." Estok Decl., Ex. 1 (Dodge Depo. at 194:5-12). Both the encounters with Garrett and

22  the subsequent response by Evergreen have created a hostile workplace and a constructive

23  discharge, making it impossible for plaintiff to reasonably or safely return to any form of

24  employment with the Evergreen school district. Complaint ¶58. Dodge continues to suffer from

25  an increase in stuttering and balance problems since this incident. Estok Decl., Ex. 1 (Dodge

26  Page 10 – **PLAINTIFF'S OPPOSITION TO DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT - 3:20-cv-05224-JLR**
02127049.DOCX

Depo. at 323:22 – 325:5). He has a difficult time being around other people, especially teachers, and he becomes nervous and anxious—with an increase in stuttering and worry—any time he drives near Wy'East. *Id.*

Also of note, through discovery in this lawsuit, plaintiff has learned the curious fact that at the same time that Evergreen sent him his final closure letter (Dodge Decl., Ex. 4), it sent a different closure letter on the HIB Complaint to Garrett. Estok Decl., Ex. 9. While the version of the letter to Garrett began with identical language and also concluded there had been no violations of Evergreen's policies or procedures by Garrett, it paradoxically went on to state that "the Board has outstanding questions about whether you conducted yourself in an appropriate or professional manner" in her encounters with Dodge and was going to investigate her further. *Id.* Apparently seeking to conceal this fact from Dodge, Evergreen then appointed a second investigator, who met with Garrett and interviewed her in a "hostile manner" regarding her prior interactions with Dodge on the MAGA hat. Estok Decl., Ex. 2 (Garrett Depo. at 22:14 – 23:1).

After this clandestine second investigation, Garrett was told that the Board held a "strong belief [that] you didn't say some of the things to Eric as you have represented. They do not believe you are being fully forthcoming and are concerned about the professionalism which bring credibility into question." Estok Decl., Ex. 10. Ultimately, Garrett was told she needed to either (a) resign her employment with Evergreen at the end of her contracted school year, or (b) accept discipline relating to the events with Dodge and a demotion to an assistant principal position at a high school for the following year. *Id.*; Estok Decl., Ex. 2 (Garrett Depo. at 47:4 – 48:15). Facing these options, Garrett chose to resign immediately.

### D.    Discovery is Ongoing and Not Yet Completed.

While the above summary provides an overview of some key facts, discovery is still in the early stages in this case, and the discovery cutoff is not until 2/16/21. Estok Decl. ¶2. Notably, plaintiff is scheduled to depose another five key Evergreen witnesses in the coming

Page 11 – **PLAINTIFF'S OPPOSITION TO DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT - 3:20-cv-05224-JLR**
02127049.DOCX

LINDSAY HART, LLP
1300 SW FIFTH AVENUE, SUITE 3400
PORTLAND, OREGON 97201-5640
PHONE: 503-226-7677 FAX: 503-226-7697

1    weeks, including Janae Gomes.  *Id.*  As a result, plaintiff has not yet had the opportunity to

2    discover all relevant facts supporting his claims, and information from these upcoming

3    depositions is not yet available to plaintiff as of the time of this response.  *Id.*

### III.    AUTHORITY AND ARGUMENT

5            As noted by defendants, on a motion for summary judgment, the Court must view all

6    facts, and draw all reasonable inferences relating to those facts, in favor of the non-moving party,

7    here, plaintiff.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986).

### A.    First Amendment Claim under Section 1983

9            Defendants have moved against this claim only on a single, narrow ground: that

10   plaintiff's "expressive conduct" is not protected because he did not subjectively intend to express

11   any message in wearing the MAGA hat.  This argument fails for at least two reasons:

### 1)    This is a "pure speech" case

13           The premise of defendants' motion is that the MAGA hat was a form of "conduct", not

14   speech, and therefore governed by the legal standards for "expressive conduct" set forth in

15   *Spence v. Washington*, 418 U.S. 405, 409 (1974) and *Texas v. Johnson*, 491 U.S. 397 (1989).

16           In so doing, defendants apply the wrong constitutional standard.  A different standard

17   applies when "pure speech"—whether spoken or written—is at issue.  *Anderson v. City of

18   Hermosa Beach*, 621 F.3d 1051, 1058-59 (9th Cir. 2010) (noting that "pure speech" cases are

19   "entitled to full First Amendment protection without any need to resort to *Spence*'s 'sufficiently

20   imbued' test").

21           Plaintiff's MAGA hat was "pure speech": it displayed actual written words—"Make

22   America Great Again"—which were understood by all involved parties to be conveying a

23   political message in support of President Trump. *Cf. Anderson*, 621 F.3d at 1060 (holding that

24   tattoos and the process of tattooing are purely expressive activity, not merely expressive conduct,

25   and are therefore not subject to *Spence*); *see also id.* at 1060 (listing other examples of "purely

26   Page 12 – **PLAINTIFF'S OPPOSITION TO DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT - 3:20-cv-05224-JLR**
     02127049.DOCX

1   expressive activities" recognized by the Supreme Court, including music without words, topless

2   dancing, movies, parades with or without banners or written messages, and paintings; adding,

3   "[w]e have afforded these expressive activities full constitutional protection without relying on

4   the *Spence* test").

5       The MAGA hat was not only "pure speech", but it was also "political" in nature, making

6   it "entitled to the fullest possible measure of constitutional protection." *Members of City Council*

7   *v. Taxpayers for Vincent*, 466 U.S. 789, 816 (1984); *Kaahumanu v. Hawaii*, 682 F.3d 789, 798

8   (9th Cir. 2012); *see also Minn. Voters Alliance v. Mansky*, 585 U.S. __, 138 S. Ct. 1876, 1885

9   (2018) (observing that a "ban on wearing any political badge, political button, or other political

10  insignia plainly restricts a form of expression within the protection of the First Amendment");

11  *Rubin v. Young*, 373 F. Supp. 3d 1347, 1352 (N.D. Ga. 2019) ("Wearing a button with a political

12  message is a form of expression within the protection of the First Amendment"); *Baldwin v.*

13  *Redwood City*, 540 F.2d 1360, 1366 (9th Cir. 1976) ("Communication by signs and posters is

14  virtually pure speech.  The element of conduct in a sign posted on behalf of an issue or candidate

15  during a campaign is minimal", adding that "**the constitutional guarantee has its fullest and**

16  **most urgent application precisely to the conduct of campaigns for political office**") (quoting

17  *Monitor Patriot Co. v. Roy*, 410 U.S. 265, 272 (1971)) (emphasis added); *James v. Bd. of Educ.*,

18  461 F.2d 566 (2d Cir. 1972) (holding that a black arm band in protest of the Vietnam War was

19  pure speech).

20      Here, defendants' motions **assume** that the MAGA had was merely "expressive

21  conduct", but defendants provide no argument in support of that position.  *See, e.g.,*

22  *Stavrianoudakis v. U.S. Dep't of Fish & Wildlife*, 435 F. Supp. 3d 1063, 1094 (E.D. Cal. 2020)

23  ("The distinction between whether the activity is purely expressive activity, *i.e.*, pure speech, or

24  conduct that merely contains an expressive component is the former 'is more akin to writing (an

25  example of purely expressive activity)' and the latter is more akin to 'burning a draft card (an

26  Page 13 – **PLAINTIFF'S OPPOSITION TO**
    **DEFENDANTS' MOTIONS FOR SUMMARY**
    **JUDGMENT - 3:20-cv-05224-JLR**
    02127049.DOCX

1   example of conduct that can be used to express an idea but does not  necessarily do so).'")

2   (quoting *Anderson*, 621 F.3d at 1059).

3       Not surprisingly, defendants' proffered "expressive conduct" cases all involved very

4   different facts.  *See, e.g., Texas v. Johnson*, 491 U.S. 397 (1989) (flag burning); *United States v.*

5   *O'Brien*, 391 U.S. 367 (1968) (burning draft cards); *Nunez v. Davis*, 169 F.3d 1222 (9th Cir.

6   1999) (a court administrator's conduct in allowing two court clerks to attend a training seminar

7   in a refusal to follow orders from her supervisor, a sitting judge); *Vivid Entm't, LLC v. Fielding*,

8   774 F.3d 566 (9th Cir. 2014) (pornography).  None of them involved written speech akin to

9   plaintiff's MAGA hat.

10      Given that the MAGA hat falls under the protections for "pure speech", defendants' two-

11  pronged legal test is inapplicable to this case.  Plaintiff's speech in wearing the hat was entitled

12  to full First Amendment protections unless he caused substantial disruption of or material

13  interference with school activities (which no defendant has here argued):

> In order for the State in the person of school officials to justify prohibition
> of a particular expression of opinion, **it must be able to show that its**
> **action was caused by something more than a mere desire to avoid the**
> **discomfort and unpleasantness that always accompany**
> **an unpopular viewpoint.**  Certainly where there is no finding and no
> showing that engaging in the forbidden conduct would 'materially and
> substantially interfere with the requirements of appropriate discipline in
> the operation of the school,' the prohibition cannot be sustained.

19  *Tinker v. Des Moines Indep. Cmty. Sch. Dist.*, 383 U.S. 503, 509 (1969) (quoting *Burnside v.*

20  *Byars*, 363 F.2d 744, 749 (5th Cir. 1966)) (emphasis added).[2]

21      Indeed, "**In our system, state-operated schools may not be enclaves of**

22  **totalitarianism.**" *Id.* at 511 (emphasis added).  Through the targeted retaliation by defendants

23  here toward plaintiff simply due his MAGA hat, that is exactly what occurred.  Plaintiff's First

---

[2] Although no defendant has argued substantial disruption or material interference under *Tinker*,
if they should try to add this argument now, it would similarly be a genuine issue of material fact
for the jury at trial.

26  Page 14 – **PLAINTIFF'S OPPOSITION TO**
**DEFENDANTS' MOTIONS FOR SUMMARY**
**JUDGMENT - 3:20-cv-05224-JLR**
02127049.DOCX

LINDSAY HART, LLP
1300 SW FIFTH AVENUE, SUITE 3400
PORTLAND, OREGON 97201-5640
PHONE: 503-226-7677 FAX: 503-226-7697

1    Amendment claim under Section 1983 is supported by a genuine issue of material fact and

2    should be resolved by a jury.

3                   **2)**        ***Alternatively, the MAGA hat was expressive conduct***

4            Even assuming for the sake of argument that plaintiff's MAGA hat was not "pure

5    speech", it would still be "expressive conduct" subject to constitutional protections and gives rise

6    to a valid Section 1983 claim here.  As an initial matter, defendants mischaracterize the *Spence*

7    test, which was later modified to indicate that a "particularized message" is not a requisite for

8    First Amendment protection:

9                   a narrow, succinctly articulable message is not a condition of
                    constitutional protection, which if confined to expressions conveying a
10                  "particularized message," *cf. Spence v. Washington*, 418 U.S. 405, 411, 41
                    L. Ed. 2d 842, 94 S. Ct. 2727 (1974) (per curiam), would never reach the
11                  unquestionably shielded painting of Jackson Pollock, music of Arnold
                    Schoenberg, or Jabberwocky verse of Lewis Carroll.

12   *Hurley v. Irish-American Gay*, 515 U.S. 557, 569 (1995); *see also id.* (collecting cases with

13   examples of expressive conduct protected by the First Amendment where a "particularized

14   message" was not shown); *see also Kaahumanu*, 682 F.3d at 798 ("A 'narrow, succinctly

15   articulable message' is not required").

16           Of course, this distinction is somewhat academic here because a MAGA hat—which was

17   understood by everyone, including Garrett, to be a Trump campaign hat—is obviously a

18   "particularized message".

19           As for plaintiff's "intent to convey a particularized message", defendants' arguments rely

20   upon confusing deposition excerpts where counsel's questions were specifically focused on

21   Dodge's intentions in bringing the MAGA hat into a cultural-sensitivity training meeting, as

22   opposed to wearing the hat generally.  As discussed in Part II.B, above, plaintiff had no specific

23   intent in bringing the hat **into that training meeting**, as it was just incidental that he had it with

24   him at that time.  However, plaintiff has explained that he brought the hat to Wy'East to express

25   support for President Trump, because he agrees with its message, and because it shows others

26   Page 15 – **PLAINTIFF'S OPPOSITION TO
     DEFENDANTS' MOTIONS FOR SUMMARY
     JUDGMENT - 3:20-cv-05224-JLR**
     02127049.DOCX

that ordinary and normal people in the community support President Trump.  *Id.*  Indeed, common sense tells us that it was literally impossible in 2019 to wear a MAGA hat in public without it being viewed by others as an "expressive" political statement.

Thus, assuming the *Spence* test applies, whether plaintiff intended to convey a particularized message with his hat is a genuine issue of material fact for the jury at trial.  For all of these reasons, defendants' motion should be denied.

### B.  Substantive Due Process under Section 1983

As set forth in the First Amended Complaint, plaintiff asserts that his First Amendment retaliation claim includes two separate types of retaliatory conduct by defendants: (1) Garrett's direct verbal attack, threats, and restrictions that were communicated to Dodge; and (2) Evergreen's subsequent misconduct toward Dodge in how it communicated with him, how it handled the investigation on the HIB Complaint, how it failed to rectify or correct Garrett's misconduct, how it managed his benefits, etc.  With regard to the latter point, plaintiff is alleging that Evergreen's officials (including HR Director Gomes, Superintendent Merlino, and others) were biased against Dodge and took steps to retaliate against him because he wore a MAGA hat and publicly expressed support for President Trump.

Alternatively, however, if these subsequent acts of retaliation by Evergreen are "found to be unrelated to plaintiff's exercise of his constitutional right to freedom of speech under the First Amendment, then such actions and misconduct constituted violations of plaintiff's constitutional right to substantive due process under the Fourteenth Amendment to the United States Constitution."  First Amended Complaint ¶67.  "Under federal pleading standards, a plaintiff may plead claims in the alternative, even if the claims are contradictory."  *Prudential Ins. Co. of Am. v. Clark Consulting, Inc.*, 548 F. Supp. 2d 619, 623 (7th Cir. 2008); *see also* Fed. R. Civ. Pro. 8(d)(2) (allowing pleading in the alternative).

Page 16 – **PLAINTIFF'S OPPOSITION TO DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT - 3:20-cv-05224-JLR**
02127049.DOCX

LINDSAY HART, LLP
1300 SW FIFTH AVENUE, SUITE 3400
PORTLAND, OREGON 97201-5640
PHONE: 503-226-7677 FAX: 503-226-7697

Substantive due process "forbids the government from depriving a person of life, liberty, or property in such a way that shocks the conscience or interferes with the rights implicit in the concept of ordered liberty." *Corales v. Bennett*, 567 F.3d 554, 568 (9th Cir. 2009) (internal quotation omitted).   An employee with a legitimate claim of entitlement to continued employment has a property interest in his job. *Wagner v. Gibson*, Case No. WDQ-12-3581, 2013 U.S. Dist. LEXIS 126288 at *19-20 (D. Md. Sept. 4, 2013) (citing *Board of Regents v. Roth*, 408 U.S. 564, 577 (1972)).   "Substantive due process is an absolute check on government actions that is warranted only when no process could cure the deficiencies in that action." *Id.* at *20 (internal quotation omitted).   Thus, in *Wagner*, the court found that the plaintiff had plausibly alleged that she was arbitrarily and irrationally deprived of a property interest under substantive due process when her boss reported his plan to Mr. Craig to terminate the plaintiff "for the purpose of bragging to Mr. Craig that he was going to terminate the wife of Mr. Craig's political rival." *Id.* at *21.

Moreover, while it is true that substantive due process claims cannot be pursued when they are wholly "duplicative" of First Amendment claims, courts have suggested that the two claims can co-exist in one action "when, for example, the alleged conduct is arbitrary and capricious but not retaliatory" or where "the alleged conduct implicates a different interest." *See Addison v. City of Baker City*, 258 F. Supp. 3d 1207, 1235 n.6 (9th Cir. 2017) (collecting cases); *see also Schneider v. County of Sacramento*, No. S-12-2457, 2014 U.S. Dist. LEXIS 116809 at *19 (E.D. Cal. Aug. 21, 2014) ("Even if the claims stem from the single 'wrong' of the 2012 FACE, a single 'wrong[]… can implicate more than one of the Constitution's commands.'") (quoting *Soldal v. Cook County*, 506 U.S. 56, 70 (1992)); *see also, e.g., City of Sacramento v. Lewis*, 523 U.S. 833, 843 (1998) (holding that "[s]ubstantive due process analysis is therefore inappropriate in this case only if respondents' claim is 'covered by' the Fourth Amendment", finding "[i]t is not" so covered, and therefore going on to consider the merits of the due process

1    claim).  Thus, if any portion of plaintiff's allegations are not "covered" by the First Amendment,

2    then the "duplicative" concern would no longer be present.

3         Defendants mischaracterize plaintiff's substantive due process claim as only asserting

4    that "he has a constitutionally protected right to have his HIB complaint against Ms. Garrett

5    investigated in any particular manner."  Dkt. #36 at p. 12.  Rather, the claim encompasses many

6    more allegations and facts: the fact that Evergreen's HR director (Gomes) actively encouraged

7    and participated in Garrett's direct retaliation toward Dodge; the fact that the same person

8    (Gomes) arrogated to herself control over the required investigation into Dodge's HIB Complaint

9    against Garrett's despite her bias and personal interest in the proceedings; the fact that Evergreen

10   hired a "third-party investigator" and then discarded the investigator's findings when he

11   concluded that Evergreen had denied Dodge's "freedom of expression" and caused him

12   substantial harm; the fact that Gomes threatened to unlawfully release Dodge's medical

13   information to the public if he did not "rescind" his HIB Complaint; and the fact that Evergreen

14   engaged in "gaslighting" by publicly telling Dodge there was no merit to his HIB Complaint

15   while secretly investigating Garrett further and concluding she had been dishonest and removing

16   her from her position as principal at Wy'East.

17        All of these events contributed to plaintiff's constructive discharge from his public

18   employment, depriving him of his "life, liberty, and property in such a way that shocks the

19   conscience or interferes with the rights implicit in the concept of ordered liberty."  *Corales v.*

20   *Bennett*, 567 F.3d at 568; *cf. Tinker*, 383 U.S. at 509 ("In our system, state-operated schools may

21   not be enclaves of totalitarianism").  Defendants' conduct was arbitrary and capricious

22   throughout this process and violated plaintiff's substantive due process.

23        Defendants' motion for summary judgment should also be denied because it is premature.

24   First, considering that it is pled in the alternative as a "backstop" claim, the substantive due

25

26   Page 18 – **PLAINTIFF'S OPPOSITION TO**
     **DEFENDANTS' MOTIONS FOR SUMMARY**
     **JUDGMENT - 3:20-cv-05224-JLR**
     02127049.DOCX

1   process claim should be allowed to proceed to trial unless and until plaintiff's entire First

2   Amendment claim is allowed to go to the jury.

3          Second, the motion should also be denied (or alternatively deferred) under Rule 56(d) of

4   the Federal Rules of Civil Procedure given that plaintiff is unable to present additional facts to

5   support this opposition until after discovery has been completed, and especially the deposition of

6   Janae Gomes and other Evergreen officials.  *See* Estok Decl. ¶5.

7          **C.      Tort of Outrage**

8          Defendants also challenge the sufficiency of plaintiff's pendant common-law claim for

9   the tort of outrage under Washington law, which is also known as the tort of intentional infliction

10  of emotional distress.  As noted by defendants, plaintiff's elements on this claim include that:

11  "(1) he or she suffered severe emotional distress; (2) the emotional distress was inflicted

12  intentionally or recklessly, but not negligently; (3) the conduct complained of was outrageous

13  and extreme; and (4) he or she personally was subject of the outrageous conduct."  *Grange Ins.*

14  *Ass'n v. Roberts*, 179 Wn. App. 739, 753-54, 320 P.3d 77 (2013), *rev. denied*, 180 Wn.2d 1026

15  (2014).  Summary judgment should be denied because genuine issues of material fact are present

16  to support each of these elements, making the claim appropriate for resolution by a jury:

17                     *1)      Severe emotional distress*

18         The requirement of "severe" emotional distress exists to prevent a claim "in every case

19  where someone's feelings are hurt."  Restatement (2d) of Torts §46, cmt. d.  The presence of

20  "shock, illness, or other bodily harm" is "**in itself**" evidence that "the distress is genuine and

21  severe", though that degree of harm is not required where the conduct is sufficiently outrageous.

22  *Id.*, cmt. k. (emphasis added).

23         Plaintiff has submitted evidence of such "severe" emotional harm here.  As discussed

24  above, the verbal attacks by Garrett caused physical symptoms and manifestations to Dodge,

25  including stuttering, loss of coordination, and an inability to function.  *See* Part II.C.  These

26  Page 19 – **PLAINTIFF'S OPPOSITION TO**
    **DEFENDANTS' MOTIONS FOR SUMMARY**
    **JUDGMENT - 3:20-cv-05224-JLR**
    02127049.DOCX

1   symptoms prevented Dodge from working as a teacher and resulted in an extended medical

2   leave.  *Id.*  Moreover, the fact that the severity of his injuries may have been exacerbated by his

3   prior stroke injuries is no argument for the defendants: under the well-established "eggshell

4   plaintiff" rule under Washington law, "a tortfeasor takes his victim as he finds him."  *See*

5   *Buchalski v. Universal Marine Corp.*, 393 F. Supp. 246, 248 (W.D. Wash. 1975); *Reeder v.*

6   *Sears, Roebuck & Co.*, 41 Wn.2d 550, 556-57, 250 P.2d 518 (Wash. 1952).

7                    *2)       Intentional or reckless, but not negligent*

8           Plaintiff alleges that the retaliatory acts by Garrett and Evergreen were intentional: he

9   was deliberately targeted by these biased individuals for his political views and the fact that he

10  had worn at MAGA hat while at Wy'East.  Plaintiff has offered evidence to support that such

11  conduct was "intentional", and plaintiff has not alleged that any of the defendants' conduct was

12  merely "negligent".

13                   *3)       Outrageous and extreme conduct*

14          Although the Court can play a gatekeeping role on summary judgment, the question of

15  whether certain conduct is sufficiently outrageous is ordinarily for a jury.  *Dicomes v. State*, 113

16  Wn.2d 612, 630, 782 P.2d 1002 (Wash. 1989).  The conduct in question must be "so outrageous

17  in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be

18  regarded as atrocious, and utterly intolerable in a civilized community."  *Id.* (quoting *Grimsby v.*

19  *Samson*, 85 Wn.2d 52, 59, 530 P.2d 291 (Wash. 1975)); *see also* Restatement (2d) of Torts §46,

20  cmt. d ("Generally, the case is one in which the recitation of the facts to an average member of

21  the community would arouse his resentment against the actor, and lead him to exclaim,

22  'Outrageous!'").

23          Examples provided in the Restatement support such a finding in this case:

24                  A, the president of an association of rubbish collectors, summons B to a
                    meeting of the association, and in the presence of an intimidating group of
25                  associates tells B that B has been collecting rubbish in territory which the

26  Page 20 – **PLAINTIFF'S OPPOSITION TO**
    **DEFENDANTS' MOTIONS FOR SUMMARY**
    **JUDGMENT - 3:20-cv-05224-JLR**
    02127049.DOCX

1

2

3
> association regards as exclusively allocated to one of its members.   A
> demands that B pay over the proceeds of his rubbish collection, and tells B
> that if he does not do so the association will beat him up, destroy his truck,
> and put him out of business.   B is badly frightened, and suffers severe
> emotional distress.   A is subject to liability to B for his emotional distress,
> and if it results in illness, A is also subject to liability to B for his illness.

4

Restatement (2d) of Torts §46, illus. 2.  Although Dodge was not threatened with physical harm,

5

he was threatened with discipline (and by extension, the destruction of his cherished career of

6

being a public school teacher) based on his political views and deprived of his freedom of

7

expression which serves as the bedrock to civil society.

8

The Restatement also emphasized that the relationship between the individuals is an

9

important consideration on this element:

10

11

12
> The extreme and outrageous character of the conduct may arise from an
> abuse by the actor of a position, or a relation with the other, which gives
> him actual or apparent authority over the other, or power to affect his
> interests…. In particular…school authorities…have been held liable for
> extreme abuse of their position.

13

*Id.*, cmt. 3.

14

Thus, after receiving the evidence in this case, reasonable jurors will be led to exclaim

15

"Outrageous", thereby supporting this common-law tort claim.  Public schools should not be

16

totalitarian, and public employees should not have to "renounce their citizenship when they

17

accept employment".  *Lane v. Franks*, 573 U.S. 228, 235 (2014) (adding "this Court has

18

cautioned time and again that public employers may not condition employment on the

19

relinquishment of constitutional rights").  Defendants' conduct was outrageous regardless of the

20

reasonable jurors' own political beliefs: Garrett and Evergreen did not even keep the schools as a

21

politically "neutral" space; rather, certain views were permitted and even promoted, while other

22

views were not only prohibited but were retaliated against.  As a result, a genuine issue of

23

material fact exists to support this element.

24

///

25

///

26

LINDSAY HART, LLP
1300 SW FIFTH AVENUE, SUITE 3400
PORTLAND, OREGON 97201-5640
PHONE: 503-226-7677 FAX: 503-226-7697

1    *4)      Plaintiff was personally the subject of the outrageous conduct*

2          There is no question that this element is met here.  Thus, because all of the elements of

3    the tort of outrage are supported by genuine issues of material fact, defendants' motion should be

4    denied.

5                              **IV.      CONCLUSION**

6          Based on the foregoing, defendants' motions for summary judgment should be denied in

7    their entirety.

8          Dated this 30th day of November, 2020

9                              LINDSAY HART, LLP

10                        By:      */s/ Michael Estok*
                                   Michael Estok, WSBA No. 36471
11                                 1300 SW Fifth Avenue, Suite 3400
                                   Portland, OR 97201
12                                 Telephone: 503-226-7677
                                   mestok@lindsayhart.com
13

14
                           McKANNA BISHOP JOFFE, LLP
15
                           By:      */s/ Noah Barish*
16                                  Noah Barish, WSBA No. 52077
                                    1635 NW Johnson Street
17                                  Portland, OR 97209
                                    Telephone: 503-821-0960
18                                  nbarish@mbjlaw.com

19                                  *Attorneys for Plaintiff Eric Dodge*

20

21

22

23

24

25

26   Page 22 – **PLAINTIFF'S OPPOSITION TO**
     **DEFENDANTS' MOTIONS FOR SUMMARY**
     **JUDGMENT - 3:20-cv-05224-JLR**
     02127049.DOCX