UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

ERIC DODGE,

               Plaintiff,

    v.

EVERGREEN SCHOOL DISTRICT, et al.,

               Defendants.

CASE NO. C20-5224JLR

ORDER ON MOTIONS FOR SUMMARY JUDGMENT

## I.    INTRODUCTION

Before the court are two motions:  (1) Defendants Evergreen School District #114 ("EPS") and Jenae Gomes's (collectively, the "District") motion for summary judgment (Dist. MSJ (Dkt. # 36)); and (2) Defendant Caroline Garrett's motion for summary judgment (Garrett MSJ (Dkt. # 39)).  Plaintiff Eric Dodge opposes the District and Ms. Garrett's (collectively, "Defendants") motions.  (Resp. (Dkt. # 42).)  The court has considered the motions, the parties' submissions in favor of and in opposition to the

1  motions, the relevant portions of the record, and the applicable law.  Being fully advised,[1]

2  the court GRANTS in part and DENIES in part Defendants' motions.

## II.   BACKGROUND

4      Mr. Dodge, a former teacher with EPS, alleges that Defendants violated his

5  constitutional and statutory rights after he brought a "Make America Great Again"

6  ("MAGA") hat to professional development sessions before the start of the 2019-2020

7  school year.  (*See generally* Am. Compl. (Dkt. # 25).)  The court reviews the factual and

8  procedural background of this matter.

9  **A.   Factual Background**

10      The District assigned Mr. Dodge to teach science during the 2019-2020 school

11  year at Wy'east Middle School ("Wy'east"), where Ms. Garrett served as principal, in

12  Vancouver, Washington.  (Safarli Decl. (Dkt. # 40) ¶ 2, Ex. A ("Dodge Dep.") at 49:5-8;

13  49:18-24.)[2]  To prepare for the school year, Mr. Dodge reported to a cultural sensitivity

14  training session for all school staff on August 22, 2019.  (*Id.* at 71:15-17; 73:16-20.)  He

15  wore his MAGA hat from the parking lot to the front doors of the school, where he took

16  the hat off and held it in his hand as he entered the school library for the training.  (*Id.* at

17  74:10-14; 76:20-25; 80:25-81:2.)  Mr. Dodge had the MAGA hat visible on his table

18  //

19      [1] No party requests oral argument (*see* Dist. MSJ at 1; Garrett MSJ at 1; Resp. at 1), and

20  the court finds that oral argument would not be helpful to its disposition of the motions, *see* Local Rules W.D. Wash. LCR 7(b)(4).

21      [2] All parties submit portions of Mr. Dodge's deposition transcript as support for their

22  briefing.  (*See* Estok Decl. (Dkt. # 43) ¶ 3, Ex. 1; McFarland Decl. (Dkt. # 37) ¶ 2, Ex. A.)  The court refers to the deposition transcript generally as "Dodge Dep."

1   during the training.  (*See id.* at 89:8-25; Estok Decl. ¶ 10, Ex. 8 ("Hoff Rep.") at 8, 11-12;

2   Estok Decl. ¶ 4, Ex. 2 ("Garrett Dep.") at 121:22-122:2.)

3          Mr. Dodge states that he had two reasons for wearing the MAGA hat that day.

4   (Dodge Decl. (Dkt. # 44) ¶ 2; Dodge Dep. at 74:15-75:23.)  The "main reason" was that

5   his dermatologist recommended wearing a hat to protect his head and ears from the sun

6   after his skin cancer diagnosis, and the MAGA hat was the only one he had at the time.

7   (*Id.* at 74:15-75:17.)  Second, it was his birthday, and it "felt like a good day to . . . just be

8   proud of who [he is] and who we are as a country."  (*Id.* at 75:20-23.)  He elaborated that

9   by "who [he is]," he means the hat shows that he is "a fairly positive person with a . . .

10  forward, bright-looking outlook on things" and that "Make America Great . . . speaks to

11  everybody and says, Hey, let's all do our best to do whatever we can or whatever it is that

12  we're doing."  (*Id.* at 101:15-19.)  He hoped that the hat "brings up conversation" or

13  helps him "find people [with] alike interests."  (*Id.* at 100:22-101:2.)

14         However, in his deposition, Mr. Dodge denied that he brought the MAGA hat into

15  the training "to make some kind of statement."  (*Id.* at 81:15-17.)  Although he supports

16  President Donald Trump and the Republican party, he did not carry the hat into the

17  meeting to show support for President Trump, the Republican Party, or to persuade others

18  to vote for President Trump or other Republican candidates.  (*Id.* at 81:21-82:6;

19  82:11-23.)  Mr. Dodge also denied doing so as an act of protest.  (*Id.* at 83:11-24.)

20  Indeed, he denied that he intended to express any political views or ideology at all with

21  the MAGA hat.  (*Id.* at 82:7-10; 83:3-5.)  Furthermore, despite Mr. Dodge's desire to

22  show others who he is, he denied that he intended the hat to "send some type of message

1   to [his] colleagues regarding [his] personal beliefs" or "to cause other people to discuss

2   [his] political views with them." (*Id.* at 83:25-84:11.)

3          After the cultural sensitivity training, some teachers and the trainer complained

4   about Mr. Dodge's MAGA hat to Ms. Garrett. (Garrett Dep. at 121:7:14.) Ms. Garrett

5   consulted with Ms. Gomes, the Chief Human Resources Officer for EPS, on how to

6   discuss the issue with Mr. Dodge and had that conversation later that day. (Garrett Dep.

7   at 122:24-124:6; Dodge Dep. at 96:5-21.) She asked Mr. Dodge why he wore the MAGA

8   hat, and after having a "cordial" discussion about how the hat may be offensive to others,

9   she let Mr. Dodge know that although she "won't tell [him] that [he] can't wear the hat,"

10  she advised him to "use [his] better judgment." (Dodge Dep. at 98:12-99:8.) Mr. Dodge

11  took that to mean that he should not wear a MAGA hat at Wy'east. (*Id.* at 99:20-100:7.)

12         The next day, on Friday, August 23, 2019, Mr. Dodge attended a staff training

13  session at Evergreen High School. (*See id.* at 115:10-116:9.) He again wore the MAGA

14  hat while walking from his car to the school. (*Id.* at 116:6-9.) Again, Mr. Dodge

15  represents that he wore the MAGA hat for skin protection and to "show people who [he

16  is]," not to challenge Ms. Garrett's authority; communicate support for President Trump;

17  or express his political view to others at the session. (*Id.* at 122:7-21; 123:24-124:16.)

18  Mr. Dodge notes that he "didn't carry the hat into the building with any particular

19  intention" but acknowledges that expressing his views is "a side effect of being there with

20  [his MAGA] hat." (*Id.* at 124:8-9.) He did not put the hat in his backpack because he did

21  not want to crush it. (*See id.* at 127:20-128:3.) In that regard, he explained that "it

22  wouldn't have mattered if it was [the MAGA] hat, or . . . a Portland Trail Blazers hat," he

1    would have carried either one for fear of crushing it.  (*Id.*)  Other teachers from Wy'east

2    witnessed Mr. Dodge's MAGA hat and notified Ms. Garrett, and Ms. Garrett again

3    consulted Ms. Gomes on the matter.  (Garrett Dep. at 145:11-16; 148:19-23.)

4            After the training session at the high school, Mr. Dodge returned to Wy'east.  (*See*

5    Dodge Dep. at 131:3-6.)  He approached Ms. Garrett after an afternoon training session

6    to see whether there was another class at Wy'east that he could teach besides science.

7    (*Id.* at 131:24-132:6.)  According to Mr. Dodge, Ms. Garrett asked him "[w]hat is the

8    fucking deal with your hat" and said, "I thought we had an agreement about you and your

9    hat."  (*Id.* at 136:7-8; 137:22-23.)  Mr. Dodge felt "attacked at that point" and countered

10    that he "didn't wear the hat today."  (*Id.* at 136:9-15.)  Ms. Garrett then got "more and

11    more frustrated," calling him a "bigot," a "racist," a "homophobe," a "liar," and a

12    "hateful person."  (*Id.* at 138:5-15.)  She then told Mr. Dodge that she did not want him to

13    wear the MAGA hat, and "[t]he next time [she] see[s] [him] with that hat, [he] need[s] to

14    have [his] union rep."  (*Id.* at 141:5-7; 147:23-24.)  When Mr. Dodge asked about other

15    positions, Ms. Garrett interrupted that no positions were available and to contact Human

16    Resources.  (*Id.* at 141:10-21.)  Mr. Dodge perceived this exchange to be a threat of

17    discipline and an "aggressive attack."  (*Id.* at 141:1-4.)

18            Mr. Dodge emailed Ms. Garrett about the incident later that day, sharing that he

19    felt "sick to [his] stomach" by how he was treated.  (Estok Decl. ¶ 7, Ex. 5 at 4.)  He

20    expressed his concern about returning to school on Monday because he did not "have any

21    assurances or protections that [he] will be treated fairly . . . [e]specially after the

22    unprovoked attack."  (*Id.*)  Ms. Garrett forwarded the email to Ms. Gomes and responded

1  to Mr. Dodge two days later with a written summary of the events from her perspective.

2  (*See id.* at 1-2; Garrett Dep. at 145:1-3.)  Ms. Gomes replied separately to Ms. Garrett

3  that it was an "[e]xcellent response."  (Estok Decl. ¶ 7, Ex. 5 at 1.)

4      After the incident, Mr. Dodge experienced worsening symptoms that lingered

5  from a stroke he had suffered a year before.  (Dodge Decl. ¶ 5.)  He felt "sick and

6  nervous" and had trouble walking and talking.  (Dodge Dep. at 172:23-173:25.)  He was

7  unable to attend a HR meeting about the incident the following Monday, August 26,

8  2019, with Ms. Garrett, Ms. Gomes, and his union representative.  (*Id.* at 172:17-173:5.)

9  His union representative let him know after the meeting that the District would not do

10  anything further about the situation.  (*Id.* at 176:6-25.)  Subsequently, on August 27,

11  2019, Mr. Dodge filed a Harassment, Intimidation and Bullying ("HIB") complaint with

12  the District against Ms. Garrett.  (*Id.* at 180:1-5.)  The next day, having not heard

13  anything in response, Mr. Dodge began "thinking to [him]self . . . does anybody care?"

14  and did not believe he could adequately teach due to his increased stuttering, difficulty

15  walking, inability to focus, and other symptoms of a panic attack.  (*Id.* at 176:10-15;

16  177:18-21; 180:1-9; 181:8-21.)  He took a half-day off and has been on medical leave

17  since then.  (*Id.* at 180:10-13; Estok Decl. ¶ 5, Ex. 3 at 79:9-12; Dodge Decl. ¶ 5.)

18      The District, after receiving Mr. Dodge's HIB complaint, began its own

19  investigation.  Ms. Gomes oversaw the process, having already been familiar with the

20  situation through her conversations with Ms. Garrett.  (Estok Decl. ¶ 8, Ex. 6 at 1.)  Ms.

21  Gomes contacted a third-party organization, Clear Risk Solutions ("CRS"), for an

22  independent investigation.  (Gomes Decl. (Dkt. # 31) ¶ 3; *see* Hoff Rep.)  Mr. Chad Hoff

1    from CRS interviewed staff members at Wy'East, several of whom expressed discomfort

2    at seeing Mr. Dodge's MAGA hat.  (Hoff Rep. at 8, 11, 14, 17.)  Other staff members

3    expressed their belief that there was a "double standard" for different political views

4    within the school.  (*Id.* at 13.)  Mr. Hoff concluded that while Mr. Dodge was "not

5    allowed to express himself in the form of wearing the MAGA hat," Ms. Garrett did not

6    violate the District's discrimination or HIB policy.  (*Id.* at 18.)

7          While the HIB complaint was pending, Ms. Gomes received a public records

8    request from a local newspaper asking about the incident and Mr. Dodge's complaint.

9    (Dodge Dep. at 289:15-17.)  Ms. Gomes allegedly warned Mr. Dodge that the District

10   may "have to give [the newspaper] [his] entire personnel file" and expressed her concern

11   about his medical information becoming exposed.  (*Id.* at 289:17-23.)  She explained that

12   if Mr. Dodge rescinded his HIB complaint, then the District would not have to turn

13   anything over.  (*Id.* at 289:24-290:4.)  After consideration, Mr. Dodge thanked Ms.

14   Gomes for her "concern for [his] well being" but reiterated his intent to follow through

15   with the HIB complaint.  (Dodge Decl. ¶ 6, Ex. 1 at 1.)

16         On October 1, 2019, after reviewing Mr. Hoff's conclusions, Ms. Gomes notified

17   Mr. Dodge of the District's decision on his complaint.  (*See id.* ¶ 7, Ex. 2 at 1.)  The

18   District, citing the investigation, found that "multiple staff members voiced their

19   concerns and feelings of being uncomfortable during a professional development training

20   because you wore a [MAGA] hat."  (*Id.* at 2.)  The District also adopted Mr. Hoff's

21   finding that Ms. Garrett did not violate any school board policy or procedure.  (*Id.* at 2-3.)

22   Nonetheless, the District agreed to honor Mr. Dodge's request to transfer from Wy'east,

to educate employees on freedom of speech, and gave its assurance that there would be no retaliation.  (*Id.* at 3.)  The District did not share Mr. Hoff's report with Mr. Dodge at this time.  (*See generally id.*)  Mr. Dodge appealed this decision, and an appeal hearing was held before the school board on November 14, 2019.  (Dodge Decl. ¶ 8.)  The school board sent a written decision to Mr. Dodge on November 18, 2019, finding no violations under District policy or procedure.  (*Id.* ¶ 9, Ex. 4 at 1.)

The school board also sent Ms. Garrett a similar letter detailing its decision, but noted that it "is in need of further information about the interaction and exchange between [Ms. Garrett] and Mr. Dodge" because of remaining questions "about whether [she] conducted [herself] in an appropriate or professional manner."  (*See* Estok Decl. ¶ 11, Ex. 9 at 1.)  The school board notified Ms. Garrett that it would request the superintendent "to appoint an administrator to further investigate [her] interactions" so that the school board can review her performance.  (*Id.*)  After further investigation, the school board gave Ms. Garrett the options of working at Wy'east until the end of the year and quitting, or accepting some form of discipline that would demote her to an associate principal position.  (Garrett Dep. at 48:1-15.)  Ms. Garrett subsequently resigned and no longer works at Wy'east or any other school in EPS.  (*See id.* at 45:4-5.)

**B.    Procedural Background**

Mr. Dodge brought suit on March 11, 2020, asserting claims under 42 U.S.C. §§ 1985 and 1986; First Amendment retaliation and due process claims under § 1983; the Washington State Constitution; and RCW 41.06.250.  (*See* Compl. (Dkt. # 1).)  He also

//

1  sought to recover for defamation and outrage.  (*See id.*)  Defendants moved to dismiss all

2  but the outrage claim.  (MTD (Dkt. # 19) at 2.)

3      The court granted in part the motion to dismiss.  (7/30/20 Order (Dkt. # 24) at 1.)

4  It dismissed Mr. Dodge's § 1985, § 1986, Washington State Constitution, RCW

5  41.06.250, and defamation claims with prejudice.  (*Id.* at 7-13.)  It further dismissed Mr.

6  Dodge's due process claim, noting that its "vague" nature made it unclear whether the

7  conduct underlying the claim was duplicative of his First Amendment claim.  (*Id.* at 5-6.)

8  It "allow[ed Mr.] Dodge an opportunity to amend his [c]omplaint to explain exactly what

9  conduct supports his different constitutional claims" to "allow the [c]ourt to better

10 determine whether [he] has alleged two separate constitutional violations or not."  (*Id.* at

11 6.)  However, the court upheld Mr. Dodge's First Amendment claim, noting that the

12 allegations were sufficient at the pleading stage.  (*Id.* at 6-7.)

13     Mr. Dodge amended his complaint on August 27, 2020.  (*See* Am. Compl.)  He

14 brought three claims against Defendants:  (1) § 1983 First Amendment retaliation; (2)

15 § 1983 substantive due process, "stated in the alternative to" the First Amendment claim

16 "if any of the [D]efendants' action and misconduct . . . are found to be unrelated to [Mr.

17 Dodge's] exercise of his constitutional right to freedom of speech"; and (3) outrage.  (*Id.*

18 ¶¶ 59-71.)  For his substantive due process claim, Mr. Dodge incorporated the same

19 factual allegations that underlie his First Amendment claim.  (*Id.* ¶ 66.)  Defendants now

20 challenge all remaining claims.  (Dist. MSJ at 1; Garrett MSJ at 1.)

21 //

22 //

1

### III.   ANALYSIS

2     Summary judgment is appropriate if the evidence shows "that there is no genuine

3 dispute as to any material fact and the movant is entitled to judgment as a matter of law."

4 Fed. R. Civ. P. 56(a); *see Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *Galen v.*

5 *Cty. of L.A.*, 477 F.3d 652, 658 (9th Cir. 2007).  A fact is "material" if it might affect the

6 outcome of the case.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  A

7 factual dispute is "'genuine' only if there is sufficient evidence for a reasonable fact

8 finder to find for the non-moving party."  *Far Out Prods., Inc. v. Oskar*, 247 F.3d 986,

9 992 (9th Cir. 2001) (citing *Anderson*, 477 U.S. at 248-49).

10     The moving party bears the initial burden of showing there is no genuine dispute

11 of material fact and that it is entitled to prevail as a matter of law.  *Celotex*, 477 U.S. at

12 323.  If the moving party does not bear the ultimate burden of persuasion at trial, it can

13 show the absence of such a dispute in two ways:  (1) by producing evidence negating an

14 essential element of the nonmoving party's case, or (2) by showing that the nonmoving

15 party lacks evidence of an essential element of its claim or defense.  *Nissan Fire &*

16 *Marine Ins. Co. v. Fritz Cos.*, 210 F.3d 1099, 1106 (9th Cir. 2000).  If the moving party

17 meets its burden of production, the burden then shifts to the nonmoving party to identify

18 specific facts from which a fact finder could reasonably find in the nonmoving party's

19 favor.  *Celotex*, 477 U.S. at 324; *Anderson*, 477 U.S. at 252.

20     The court is "required to view the facts and draw reasonable inferences in the light

21 most favorable to the [nonmoving] party."  *Scott v. Harris*, 550 U.S. 372, 378 (2007).

22 The court may not weigh evidence or make credibility determinations in analyzing a

1   motion for summary judgment because those are "jury functions, not those of a judge."

2   *Anderson*, 477 U.S. at 249-50.  Nevertheless, the nonmoving party "must do more than

3   simply show that there is some metaphysical doubt as to the material facts . . . .  Where

4   the record taken as a whole could not lead a rational trier of fact to find for the

5   nonmoving party, there is no genuine issue for trial."  *Scott*, 550 U.S. at 380 (internal

6   quotation marks omitted) (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*,

7   475 U.S. 574, 586-87 (1986)).

8        Defendants argue that Mr. Dodge's remaining three claims must be dismissed as a

9   matter of law.  (Dist. MSJ at 1-2; Garrett MSJ at 1.)  Mr. Dodge disagrees and

10  alternatively asks under Federal Rule of Civil Procedure 56(d) for Defendants' summary

11  judgment challenges to be "denied or deferred . . . given that discovery is still in the early

12  stages." (Resp. at 2.)  The court first addresses Mr. Dodge's Rule 56(d) argument before

13  addressing Defendants' summary judgment motions on the merits.

14  **A.    Federal Rule of Civil Procedure 56(d)**

15       Mr. Dodge requests that the court deny or defer ruling on the motions under

16  Federal Rule of Civil Procedure 56(d).  (Resp. at 2.)  As support, Mr. Dodge submits

17  declaration testimony that "certain facts essential to justify [Mr. Dodge's] deposition are

18  not yet available" because it has yet to depose five witnesses from the District, including

19  Ms. Gomes.  (Estok Decl. ¶ 2.)  The court denies the request to deny or defer ruling

20  because Mr. Dodge has failed to make the necessary showing under Rule 56(d).

21       Federal Rule of Civil Procedure 56(d) allows a court to deny or defer a motion for

22  summary judgment "[i]f a nonmovant shows by affidavit or declaration that, for specified

1   reasons, it cannot present facts essential to justify its opposition."  Fed. R. Civ. Pro.

2   56(d).  The requesting party must show:  (1) the "specific facts it hopes to elicit from

3   further discovery"; (2) that "the facts sought exist"; and (3) the "sought-after facts are

4   essential to oppose summary judgment."  *Family Home & Fin. Ctr., Inc. v. Fed. Home*

5   *Loan Mortg. Corp.*, 525 F.3d 822, 827 (9th Cir. 2008).  Failure to comply with these

6   requirements "is a proper ground for denying discovery and proceeding to summary

7   judgment."  *Id.* (quoting *Brae Transp., Inc. v. Coopers & Lybrand*, 790 F.2d 1439, 1443

8   (9th Cir. 1986)) (internal quotation marks omitted).

9        Mr. Dodge does not meet any of the requirements.  Although he notes that there

10  are five depositions left to be taken, he states no "specific facts [he] hopes to elicit" from

11  those depositions.  (*See* Estok Decl. ¶ 2.)  Correspondingly, he makes no showing that

12  any specific fact exists or how those facts are essential to oppose summary judgment.

13  (*See id.*)  Thus, the court denies Mr. Dodge's request under Rule 56(d) and proceeds to

14  consider the merits of the Defendants' summary judgment motions.

15  **B.    Defendants' Motions for Summary Judgment**

16       Defendants challenge all three of Mr. Dodge's remaining claims.  (Dist. MSJ at 1;

17  Garrett MSJ at 1.)  The court considers each claim in turn.

18       1.  First Amendment Retaliation

19       To establish a prima facie case of retaliation under the First Amendment, a

20  plaintiff must first show that he engaged in protected speech.  *See Thomas v. City of*

21  *Beaverton*, 379 F.3d 802, 807-08 (9th Cir. 2004).  The parties disagree over what

22  category of speech is presented in this case.  Defendants assert that Mr. Dodge's MAGA

1    hat constitutes expressive conduct and is not protected speech under the First Amendment

2    because he did not intend to convey a particularized message through wearing the hat.

3    (Dist. MSJ at 12-16; Garrett MSJ at 8-11.)  Mr. Dodge maintains that the standards for

4    expressive conduct do not apply because wearing a political badge, such as the MAGA

5    hat, falls squarely within the First Amendment's protection.  (Resp. at 12-15.)  The court

6    agrees with Mr. Dodge.

7         "Pure speech," often described as purely expressive activity, is generally entitled

8    to First Amendment protection.  *Anderson v. City of Hermosa Beach*, 621 F.3d 1051,

9    1058 (9th Cir. 2010).  Conduct, on the other hand, warrants constitutional protection only

10   if it is "sufficiently imbued with elements of communication," which means that (1) the

11   conduct had "a[n] intent to convey a particularized message"; and (2) "the likelihood [is]

12   great that the message w[ill] be understood by those who view [] it."  *Id.* (quoting *Spence*

13   *v. Washington*, 418 U.S. 405, 409-11 (1974)) (internal quotation marks omitted).  The

14   distinction between pure speech and expressive conduct is that "the former 'is more akin

15   to writing (an example of purely expressive activity)' and the latter is more akin to

16   'burning a draft card (an example of conduct that can be used to express an idea but does

17   not necessarily do so).'"  *Stavrianoudakis v. U.S. Dep't of Fish & Wildlife*, 435 F. Supp.

18   3d 1063, 1094 (E.D. Cal. 2020) (quoting *Anderson*, 621 F.3d at 1059).

19        Courts have consistently ruled that political speech is "entitled to the fullest

20   possible measure of constitutional protection."  *Members of City Council of Los Angeles*

21   *v. Taxpayers for Vincent*, 466 U.S. 789, 816 (1984); *see also Kaahumanu v. Hawaii*, 682

22   F.3d 789, 798 (9th Cir. 2012).  "Whatever differences may exist about interpretations of

1   the First Amendment, there is practically universal agreement that a major purpose of that

2   Amendment was to protect the free discussion of governmental affairs." *Burson v.*

3   *Freeman*, 504 U.S. 191, 196 (1992).  In *Baldwin v. Redwood City*, 540 F.2d 1360 (9th

4   Cir. 1976), which involved posting political campaign signs, the Ninth Circuit recognized

5   that there is an "element of conduct in a sign posted on behalf of an issue or candidate"

6   but found that element to be "minimal." *Id.* at 1366.  Because the signs involved political

7   speech, the Ninth Circuit did not need to analyze the intent behind the political signs to

8   hold that "[s]ignificant First Amendment interests are involved." *Id.*  Similarly, in

9   *Minnesota Voters Alliance v. Mansky*, --- U.S. ----, 138 S. Ct. 1876 (2018), the Supreme

10  Court considered an ordinance that banned any "political badge, political button, or other

11  political insignia" in a polling area and held that it "plainly restricts a form of expression

12  within the protection of the First Amendment" without analyzing the intent behind why

13  one wore the political material.  *Id.* at 1885.

14       Given this clear jurisprudence, the court determines that wearing a MAGA hat

15  constitutes political speech that is protected by the First Amendment.  Defendants do not

16  dispute that the MAGA hat is a political badge, symbolizing support for President Trump

17  and his campaign.  (*See* Dist. MSJ; Garrett MSJ.)  The MAGA hat contains words that

18  convey a substantial message, and the object itself is a form of political speech.  Wearing

19  a MAGA hat is akin to posting a political sign or donning a campaign button.  While

20  there may be some modicum of conduct involved in putting on the MAGA hat, as there is

21  in posting a political sign, that conduct is minimal and thus does not push political speech

22  into the expressive conduct category.  *See Baldwin*, 540 F.2d at 1366.

1    Defendants offer no case law that qualifies political campaign speech as

2    expressive conduct, nor do they present any case that analyzes the intent behind a

3    political badge to determine if First Amendment protections apply.[3]  (*See* Dist. MSJ at

4    13; Garrett MSJ at 9; Dist. Reply (Dkt. # 46) at 6-8 (citing various cases that analyze

5    general clothing, not political campaign materials).)  Indeed, the Defendants' cited case

6    law reaches the opposite conclusion:  "Clothing that bears messages or symbols which

7    are intended to convey a political . . . message can clearly amount to speech entitling the

8    wearer to First Amendment protection" because although "wearing the [item] is

9    conduct," "the [items] themselves are pure speech, in that they contain images and words

10   that convey a message."  *N.J. v. Sonnabend*, Nos. 20-C-227, 20-C-276, 2020 WL

11   6546058, at *3 (E.D. Wis. Nov. 6, 2020) (quoting *Schoenecker v. Koopman*, 349 F. Supp.

12   3d 745, 751 (E.D. Wis. 2018)); (Dist. Reply at 7.)

13        Even if the court agreed with Defendants that this case concerns expressive

14   conduct, the record reflects a genuine issue of material fact as to whether Mr. Dodge

15   intended to convey a particularized message by wearing his MAGA hat.  Defendants

16   focus on portions of Mr. Dodge's deposition where he repeatedly denies wanting to

17   "make some kind of statement," political or otherwise.  (Dist. MSJ at 5-9; Garrett MSJ at

18

19        [3] Defendants pivot on reply and raise the new argument that Mr. Dodge did not speak on
     a matter of public concern.  (Dist. Reply at 3; Garrett Reply at 2-6; *see* Dist. MSJ at 12-16;
20   Garrett MSJ at 8-11.)  "It is not acceptable legal practice to present new evidence or new
     argument in a reply brief."  *Roth v. BASF Corp.*, No. C07-0106MJP, 2008 WL 2148803, at *3
21   (W.D. Wash. May 21, 2008); *see also Bridgham-Morrison v. Nat'l Gen. Assembly Co.*, No.
     C15-0927RAJ, 2015 WL 12712762, at *2 (W.D. Wash. Nov. 16, 2015) ("For obvious reasons,
22   new arguments . . . presented for the first time on Reply . . . are generally waived or ignored.").
     Thus, the court does not consider the public concern argument.

1    4-5.)  But Defendants gloss over the fact that Mr. Dodge also repeatedly explained in his

2    deposition that one reason for wearing the MAGA hat—albeit, a secondary one—was to

3    "show people who [he is]," including the fact that he supported President Trump and the

4    "Make America Great Again" message.  (Dodge Dep. at 75:20-23; 100:22-101:2;

5    101:15-19; 122:18-21; *see also* Dodge Decl. ¶ 2 ("The hat expresses my support for

6    President Trump . . . [I]t shows others that ordinary and normal people in the community

7    support President Trump.").)[4]  This evidence, taken in the light most favorable to Mr.

8    Dodge, is sufficient to create a genuine issue of material fact as to whether Mr. Dodge

9    intended to convey a particularized message by wearing his MAGA hat.

10         In short, the court determines that Mr. Dodge engaged in protected political

11   speech—namely, wearing a MAGA hat—and even if his speech falls into the expressive

12   conduct category, there is a genuine issue of material fact as to whether he intended to

13   convey a particularized message by wearing the MAGA hat.  Accordingly, the court

14   denies summary judgment on Mr. Dodge's First Amendment retaliation claim.

15         2.  Substantive Due Process

16         Defendants next challenge Mr. Dodge's substantive due process claim.  At the

17   outset, the court agrees with Ms. Garrett that Mr. Dodge's response makes clear that "the

18   //

19

20         [4] Defendants argue that Mr. Dodge is "attempting to contradict his unequivocal
     deposition testimony" through his declaration testimony.  (Dist. Reply at 4; Garrett Reply at 5.)
     Not so.  While Mr. Dodge's declaration more clearly sets out the two reasons for wearing his

21   MAGA hat, he mentioned both reasons several times in his deposition.  (*See, e.g.*, Dodge Dep. at
     74:15-75:23.)  To the extent that Defendants are challenging his credibility for allegedly
     contradictory sentiments, the court may not make such credibility determinations on summary

22   judgment.  *See Anderson*, 477 U.S. at 249-50.

1    substantive due process claim is not directed at [Ms.] Garrett and targets only the alleged

2    conduct of [the District]."  (Garrett Reply (Dkt. # 49) at 8.)  Although Mr. Dodge brings

3    the claim "against all defendants" (Am. Compl. at 12), he now separates Ms. Garrett's

4    actions from the District's "subsequent misconduct" and focuses only on the District's

5    actions for his substantive due process claim, articulating that "if these subsequent acts of

6    retaliation by Evergreen are 'found to be unrelated to . . . the First Amendment, then such

7    actions and misconduct constituted violations of . . . substantive due process'" (Resp. at

8    16).  Thus, the court grants Ms. Garrett's motion for summary judgment on this issue and

9    dismisses Mr. Dodge's due process claim against her.

10          The District raises two further reasons for dismissal as a matter of law.  First, they

11   argue that the substantive due process claim is still duplicative of the First Amendment

12   retaliation claim.  (Dist. MSJ at 10-11; Dist. Reply at 9.)  Second, the District argues that

13   even if the substantive due process claim is not duplicative, Mr. Dodge has failed to show

14   the deprivation of a constitutionally protected life, liberty or property interest.  (Dist. MSJ

15   at 10-12; Dist. Reply at 10.)  The court agrees that both arguments warrant dismissal.

16          First, Mr. Dodge's substantive due process claim is duplicative of his First

17   Amendment claim.  As the court laid out in its previous order, plaintiffs cannot "double

18   up" constitutional claims.  (7/30/20 Order at 5 (quoting *Ramirez v. Butte-Silver Bow*

19   *Cnty.*, 298 F.3d 1022, 1029 (9th Cir. 2002)).)  If "a particular Amendment 'provides an

20   explicit textual source of constitutional protection' against a particular sort of government

21   behavior, 'that Amendment, not the more generalized notion of substantive due process,

22   must be the guide for analyzing these claims.'"  *Albright v. Oliver*, 510 U.S. 266, 273

1    (1994) (quoting *Graham v. Connor*, 490 U.S. 386, 395 (1989)).  Because it was unclear

2    "what conduct violated which right," the court allowed Mr. Dodge to specify in his

3    amended complaint how the due process claim involved "different conduct or

4    implicate[d] a different interest" from the First Amendment claim.  (7/20/20 Order at 5-6

5    (quoting *Addison v. City of Baker City*, 258 F. Supp. 3d 1207, 1235 n.6 (D. Or. 2017)).)

6          Interestingly, in his amended complaint and response, Mr. Dodge seems to have

7    doubled down on the notion that the same conduct and interests support both

8    constitutional claims.  He incorporates the same factual allegations to support both his

9    First Amendment and due process claims; he additionally references the same District

10   "actions and misconduct" for both.  (Am. Compl. ¶¶ 66-67.)  Moreover, he explicitly

11   states in his response that the District's "acts of retaliation" underlying his First

12   Amendment claim—"how [the District] communicated with him, how it handled the

13   investigation on the HIB Complaint, how it failed to rectify or correct Garrett's

14   misconduct, how it managed his benefits, etc."—are the same acts that violate substantive

15   due process.  (Resp. at 16.)  After this clarification that the same conduct and interests

16   underlie both constitutional claims, the court must dismiss the substantive due process

17   claim, as courts have done in numerous other cases where two constitutional claims are

18   "based on the same conduct."  *See, e.g.*, *Addison*, 258 F. Supp. 3d at 1235.

19         Rather than asserting different conduct or interests, Mr. Dodge pursues a novel

20   strategy of pleading his substantive due process claim "in the alternative."  (*See* Am.

21   Compl. ¶ 67; Resp. at 16.)  But he points to no case law that allows duplicative

22   //

constitutional claims to be pled in the alternative.[5]  (*See* Resp. at 16-19.)  Indeed, his case

law supports the notion that a substantive due process claim can only survive if (1) it

concerns action not covered by another Amendment, *Cty. of Sacramento v. Lewis*, 523

U.S. 833, 843 (1988); or (2) it is based on different conduct or alleges harm to different

interests, *Schneider v. Cty. of Sacramento*, No. S-12-2457 KJM KJN, 2014 WL 4187364,

at *5 (E.D. Cal. Aug. 21, 2014).  Neither consideration is present here.  (*See* Resp. at

16-19.)  Thus, the court declines to condone alternative pleading as a way to circumvent

the established law regarding duplicative constitutional claims.

But even if the substantive due process claim were not duplicative, Mr. Dodge has

failed to assert a constitutionally protected interest of which he was deprived.  To state a

substantive due process claim, he must show "as a threshold matter that [the District]

deprived [him] of a constitutionally protected life, liberty or property interest." *Shanks v.

Dressel*, 540 F.3d 1082, 1087 (9th Cir. 2008).  The protections of substantive due process

have "for the most part" been reserved for "matters relating to marriage, family,

procreation, and the right to bodily integrity." *Albright*, 510 U.S. at 272.  Courts have

"always been reluctant to expand the concept of substantive due process because

guideposts for responsible decisionmaking in this unchartered area are scarce and open-

ended." *Collins v. City of Harker Heights, Tex.*, 503 U.S. 115, 125 (1992).

//

//

---

[5] Mr. Dodge presents one out-of-circuit district court case in which breach of contract and unjust enrichment claims were pled in the alternative.  (Resp. at 16 (citing *Prudential Ins. Co. of Am. V. Clark Consulting, Inc.*, 548 F. Supp. 2d 619, 622-24 (N.D. Ill. 2008)).)

1    Mr. Dodge does not assert that his life or liberty interests were deprived; instead,

2 he argues that he has a property interest in his employment.  (Resp. at 17-18.)  He is

3 correct that "[a]n employee with a legitimate claim of entitlement to continued

4 employment has a property interest in his job."  (Resp. at 17 (citing *Wagner v. Gibson*,

5 No. WDQ-12-3581, 2013 WL 4775380, at *6 (D. Md. Sept. 4, 2013).)  But this

6 "legitimate entitlement to continued employment" only exists when "contractual or

7 statutory provisions guarantee continued employment."  *Wagner*, 2013 WL 4775380, at

8 *6; *see also Bishop v. Wood*, 426 U.S. 341, 344 (1976) ("A property interest in

9 employment can, of course, be created by ordinance, or by an implied contract.  In either

10 case, however, the sufficiency of the claim of entitlement must be decided by reference to

11 state law.")  In *Wagner*, a property interest in employment existed because the relevant

12 county code guaranteed continued employment by requiring "just cause" before

13 termination.  2013 WL 4775380, at *6.  Mr. Dodge offers no contractual or statutory

14 provisions to show an entitlement to continued employment.  (*See* Resp. at 16-19.)

15 Accordingly, the court determines that Mr. Dodge has failed to establish a property

16 interest in his employment.

17    Nor do any of Mr. Dodge's other allegations of misconduct implicate a

18 constitutionally protected interest.  Mr. Dodge challenges how the District advised Ms.

19 Garrett; how it communicated with Mr. Dodge, including Ms. Gomes's alleged attempt to

20 "blackmail" Mr. Dodge; how it handled the HIB complaint investigation and its decision;

21 and how it managed his benefits.  (Resp. at 16.)  But these details of the workplace,

22 including conditions and personnel decisions, do not implicate constitutionally protected

1    property interests.  *See, e.g.*, *Collins*, 503 U.S. at 129.  The Due Process Clause does not

2    "guarantee employees a workplace that is free of unreasonable risks of harm," nor does it

3    guarantee against "incorrect or ill-advised personnel decisions."[6]  *Id.*  Furthermore, there

4    is no constitutional due process right to "have an investigation carried out in a particular

5    way," even when the plaintiff is the target of the investigation.  *Devereaux v. Abbey*, 263

6    F.3d 1070, 1075 (9th Cir. 2001).  Mr. Dodge, of course, was not the target of the HIB

7    complaint, so it follows that his claim to a constitutionally protected interest based on the

8    investigation is even more tenuous.  The court declines to expand the substantive due

9    process doctrine in such a way.

10         Put simply, "[t]o have a property interest . . . [a] mere 'unilateral expectation' of a

11    benefit or privilege is insufficient; the plaintiff must 'have a legitimate claim of

12    entitlement to it.'"  *Nunez v. City of Los Angeles*, 147 F.3d 867, 872 (9th Cir. 1998)

13    (quoting *Bd. of Regents of State Colls. v. Roth*, 408 U.S. 564, 577 (1972)).  Mr. Dodge

14    has not established a legitimate claim of entitlement to continued employment.  And

15    although Mr. Dodge may have expected the District to have handled the events

16    surrounding August 23, 2019, differently, he has failed to establish any entitlement to it.

17    Accordingly, he has failed to establish a constitutionally protected property interest, and

18    his substantive due process claim fails as a matter of law.

19    //

20
     _____

21         [6] The Supreme Court has explained that federal court "is not the appropriate forum in
     which to review the multitude of personnel decisions that are made daily by public agencies.  We
     must accept the harsh fact that numerous individual mistakes are inevitable in the day-to-day
22    administration of our affairs.  The United States Constitution cannot feasibly be construed to
     require federal judicial review for every such error."  *Bishop*, 426 U.S. at 349-50.

In sum, the court grants summary judgment to Defendants on Mr. Dodge's substantive due process claim.  First, as to Ms. Garrett, Mr. Dodge's claim does not concern her and thus is dismissed with prejudice.  Second, as to the District, Mr. Dodge's claim is duplicative of his First Amendment retaliation claim, and he does not identify a constitutionally protected interest.  Accordingly, Mr. Dodge's substantive due process claim against the District is also dismissed with prejudice.

### 3. Outrage

Lastly, Defendants argue Mr. Dodge's outrage claim must be dismissed as a matter of law.  (Dist. MSJ at 16-18; Garrett MSJ at 13-14.)  To establish an outrage claim, also known as intentional infliction of emotional distress, "a plaintiff must prove (1) outrageous and extreme conduct by the defendant, (2) the defendant's intentional or reckless disregard of the probability of causing emotional distress, and (3) actual result to the plaintiff of severe emotional distress."  *Steinbock v. Ferry Cty. Pub. Util. Dist. No. 1*, 269 P.3d 275, 282 (Wash. Ct. App. 2011).  Defendants challenge Mr. Dodge's outrage claim under the first element—that the conduct complained of was not outrageous and extreme.  (EPS MSJ at 16-18; Garrett MSJ at 13-14.)  The court agrees.[7]

There is a stringent standard for outrageousness.  It must be predicated on behavior "so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a

---

[7] Although this first element is generally a factual question reserved for the jury, courts faced with a summary judgment motion must "first determine whether reasonable minds could differ on whether the conduct was sufficiently extreme to result in liability."  *Strong v. Terrell*, 195 P.3d 977, 982 (Wash. Ct. App. 2008).

1   civilized community." *Kloepfel v. Bokor*, 66 P.3d 630, 632 (Wash. 2003) (quoting

2   *Grimsby v. Samson*, 530 P.2d 291, 295 (Wash. 1975)) (internal quotation marks omitted).

3   Put colloquially, the conduct must be so offensive that it leads a reasonable person to

4   exclaim, "Outrageous!" *Sutton v. Tacoma Sch. Dist. No. 10*, 324 P.3d 763, 769 (Wash.

5   Ct. App. 2014).  Mere "insults, indignities, threats, annoyances, petty oppressions, or

6   other trivialities" will not suffice.  *Kloepfel*, 66 P.3d at 632.  Courts have repeatedly

7   recognized that in this area, "plaintiffs must necessarily be hardened to a certain degree

8   of rough language, unkindness and lack of consideration." *Id.*

9       As such, courts have only recognized severe conduct as sufficiently outrageous to

10  survive summary judgment.  In *Kloepfel*, the defendant ignored several restraining orders

11  that the plaintiff had secured against him; stalked her home and those of the men she

12  knew; called her home 640 times and her work 100 times; and threatened to kill both the

13  plaintiff and the man she was dating.  66 P.3d at 631.  In *Sutton*, a teacher pinned a first-

14  grade student with special needs against the wall as he got into her face and berated her

15  so loudly it could be heard down the hall.  324 P.3d at 769.  Conversely, in *Strong*, a

16  supervisor verbally abused an employee daily over the course of two years by "screaming

17  at her and criticizing her work"; ridiculing her personal appearance; and disparaging her

18  personal life, including her family.  195 P.3d at 979-80.  The court held that this conduct

19  did not exceed all possible bounds of decency as measured against an objective standard

20  of reasonableness.  *Id.* at 982.  At worst, the court concluded, the employee's allegations

21  "fall within the category of 'insults, indignities, threats, annoyances, petty oppressions, or

22  other trivialities.'"  *Id.* (quoting *Grimsby*, 530 P.2d at 295).

1    The evidence here against Ms. Garrett, taken in the light most favorable to Mr.

2    Dodge, is more akin to *Strong* than *Kloepfel* or *Sutton*.  Mr. Dodge presents evidence of a

3    single meeting on August 23, 2019, during which Ms. Garrett insulted and threatened

4    discipline against him in a hostile and aggressive manner.  (*See, e.g.*, Dodge Dep. at

5    136:7-8; 136:9-15; 138:5-15; 141:5-7.)  While undoubtedly upsetting to Mr. Dodge, this

6    single instance falls short of even the conduct that was insufficient in *Strong*, which

7    featured personal attacks stretching over two years.  *See* 195 P.3d at 979-80.  Even if Ms.

8    Garrett had actually terminated Mr. Dodge during the meeting—which did not occur—

9    "the fact of discharge itself is not sufficient to support a claim of outrage."  *Dicomes v.*

10   *State*, 782 P.2d 1002, 1013 (Wash. 1989).  The court concludes, as in *Strong*, that at

11   worst, Ms. Garrett's conduct falls within the category of insults, indignities, and threats,

12   all of which are insufficient to sustain an outrage claim.[8]  *See* 195 P.3d at 982.

13   Tellingly, Mr. Dodge offers no case law to the contrary.  Instead, he relies on an

14   example provided by the Restatement of Torts.  (Resp. at 20-21.)  The example involves

15   a "president of an association" who publicly, "in the presence of an intimidating group of

16   associates," demands payment from a member; otherwise, the president informs the

17   member, "the association will beat him up, destroy his truck, and put him out of

18   business."  Restatement (Second) of Torts § 46, illus. 2 (Am. L. Inst. 1975).  But Ms.

19

20   [8] The court agrees with Mr. Dodge that "the relationship between the individuals is an
21   important consideration" and that Ms. Garrett was his superior.  (*See* Resp. at 21.)  However, as
     *Strong* illustrates, the employer-employee dynamic alone is insufficient.  *See* 195 P.3d at 982;
     *see also Taing v. Boeing Co.*, 50 F. App'x 807, 810 (9th Cir. 2002) (holding that supervisor
22   yelling at and "berat[ing]" employee, which caused employee to be hospitalized, "simply are not
     the types of behavior that Washington law recognizes as atrocious and utterly intolerable").

1   Garrett did not confront Mr. Dodge with an intimidating group; she did not threaten

2   violence or property damage; and she certainly did not leverage the power of a mob

3   group to coerce Mr. Dodge.  (*See generally* Dodge Dep.)  Thus, even taking the evidence

4   in the light most favorable to Mr. Dodge, his evidence falls short of his own example.

5           As to the District, it is unclear what specific conduct Mr. Dodge is complaining of.

6   (*See* Resp.)  Neither Ms. Gomes nor any other representative of EPS was present at the

7   August 23 meeting.  (*See* Dodge Dep. at 135-42.)  Furthermore, any action the District

8   took outside Mr. Dodge's presence cannot be the underlying conduct for an outrage

9   claim.  *See Reid v. Pierce Cnty.*, 961 P.2d 333, 337-38 (Wash. 1998).  Thus, any conduct

10  related to the District's handling of the investigation that Mr. Dodge did not witness, such

11  as how Ms. Gomes communicated with CRS to finalize its investigation or any

12  subsequent investigation of Ms. Garrett, cannot sustain the outrage claim.  Nor does Ms.

13  Gomes's alleged "blackmail" over the potential release of Mr. Dodge's medical

14  records—which Mr. Dodge "appreciate[d]" as "concern for [his] well being" (Dodge

15  Decl. ¶ 6, Ex. 1 at 1)—meet the stringent standard of conduct "beyond all possible

16  bounds of decency," *see Kloepfel*, 66 P.3d at 632.  The remainder of the District's

17  communications with Mr. Dodge, such as the letters communicating the District and

18  school board's final decisions regarding his HIB complaint, fall even farther from

19  satisfying that standard even if they were biased as Mr. Dodge maintains.  *See id.*

20          Mr. Dodge asserts generally that the District "did not even keep the schools as a

21  politically 'neutral' space," suggesting that the District and Ms. Garrett turned Wy'east

22  into a "totalitarian" space.  (Resp. at 21.)  This vague assertion is not enough, either in

specificity or on its merits, to qualify as the "atrocious" and "utterly intolerable" conduct needed for an outrage claim. *Downing v. West Haven Board of Education* presents remarkably similar facts. *See* 162 F. Supp. 2d 19 (D. Conn. 2001).[9] There, a teacher wore a "JESUS 2000 J2K" t-shirt to school and alleged that her assistant principal silenced her by requiring her to change or cover up her t-shirt. *Id.* at 34. The court held that "no reasonable juror could conclude that the [district's] conduct was atrocious and exceeded all bounds usually tolerated by decent society." *Id.* The same is true here.

As a matter of law, there is no genuine issue of material fact supporting Mr. Dodge's outrage claim. Accordingly, the court grants summary judgment in favor of Defendants on Mr. Dodge's outrage claim.

## IV.   CONCLUSION

For the foregoing reasons, the court GRANTS in part and DENIES in part EPS and Ms. Gomes's motion for summary judgment (Dkt. # 36) and Ms. Garrett's motion for summary judgment (Dkt. # 39). The court dismisses Mr. Dodge's substantive due process and outrage claims with prejudice.

Dated this 13th day of January, 2021.

JAMES L. ROBART
United States District Judge

---

[9] Although *Downing* concerned an intentional infliction of emotional distress claim under Connecticut law, the elements are identical, and Connecticut adopts, as Washington courts do, the definition of extreme and outrageous conduct in the Second Restatement of Torts. *Compare* 162 F. Supp. 2d at 33-34, *with Grimsby*, 530 P.2d at 295.