UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

ERIC DODGE,

                Plaintiff,

    v.

EVERGREEN SCHOOL DISTRICT
#114, et al.,

                Defendants.

CASE NO. C20-5224 JLR

ORDER ON MOTIONS FOR
SUMMARY JUDGMENT AND
MOTION TO EXCLUDE

## I.    INTRODUCTION

Before the court are (1) Defendants Evergreen School District #144 ("EPS") and

Jenae Gomes's (collectively, the "District") motion for summary judgment (Dist. 2d MSJ

(Dkt. # 53)); (2) Defendant Caroline Garrett's (collectively with the District,

"Defendants") motion for summary judgment (Garrett 2d MSJ (Dkt. # 56)); (3)

Defendants' motion for summary judgment on the issue of damages (Damages MSJ (Dkt.

# 64)); (4) Plaintiff Eric Dodge's motion for summary judgment against Ms. Gomes and

Ms. Garrett (Dodge MSJ (Dkt. # 82)); and (5) Defendants' motion to exclude certain witness testimonies (MTE (Dkt. # 83)). Mr. Dodge opposes the Defendants' motions (2d MSJ Resp. (Dkt. # 67); Damages MSJ Resp. (Dkt. # 85); MTE Resp. (Dkt. # 94)), and Defendants oppose Mr. Dodge's motion (Dist. Dodge MSJ Resp. (Dkt. # 87); Garrett Dodge MSJ Resp. (Dkt. # 89)). The court has considered the motions, the parties' submissions in support of and in opposition to the motions, the relevant portions of the record, and the applicable law. The court also heard oral argument on Thursday, April 29, 2021. (4/29/21 Min. Entry (Dkt. # 96).) Being fully advised, the court GRANTS Defendants' motions for summary judgment and DENIES as moot the remaining motions.

## II. BACKGROUND

Mr. Dodge, a former teacher with EPS at Wy'East Middle School ("Wy'East"), alleges that Defendants violated his First Amendment rights after he brought a "Make America Great Again" ("MAGA") hat to training sessions before the 2019-2020 school year.[1] (*See generally* Am. Compl. (Dkt. # 25); Gomes Decl. (Dkt. # 74) ¶ 3.) Wy'East is a middle school in Vancouver, Washington with a "rapidly rising population of Latino/Latina students, and in some cases, potentially undocumented students." (Garrett Decl. (Dkt. # 55) ¶ 2.) Ms. Garrett served as principal of Wy'East for nine and half years and oversaw a three-year school improvement process mandated by the Office of

//

---

[1] The court has detailed the factual and procedural background of this case in several prior orders. (*See* 07/30/20 Order (Dkt. # 24); 11/23/20 Order (Dkt. #41); 01/13/21 Order (Dkt. # 52).) Thus, the court recounts here only the information relevant to the present motions.

Superintendent of Public Instruction ("OSPI") to "address the academic needs of and become more culturally responsive to the ELL (English Language Learner) students." (*Id.* ¶ 3; *see also* 2/5/21 Safarli Decl. (Dkt. # 58) ¶ 2, Ex. 1 ("Garrett Dep.") at 73:10-13.[2]) The court details the factual background before turning to the procedural background.

## A.    Factual Background

This suit centers on two encounters between Ms. Garrett and Mr. Dodge on August 22 and 23, 2019, and the aftermath of those incidents. The court first recounts the events of those two days. It then reviews Mr. Dodge's Harassment, Intimidation and Bullying ("HIB") complaint against Ms. Garrett, the District's ensuing investigation, and Mr. Dodge's appeal to the school board. Finally, it reviews Mr. Dodge's leave details.

### 1.    August 22, 2019

On August 22, 2019, as part of addressing "OSPI's objective of creating an atmosphere within the school of tolerance and cultural sensitivity," Wy'East required all faculty to attend a cultural sensitivity training hosted by Dr. Shameem Rakha. (Garrett Decl. ¶ 4; Garrett Dep. at 110:15-20; 11/12/20 Safarli Decl. (Dkt. # 40) ¶ 2, Ex. A ("Dodge Dep.") at 71:15-21.[3]) No school was in session that day, but state-mandated testing for ELL students was taking place on school grounds. (Garrett Decl. ¶ 4.)

---

[2] All parties submit portions of Ms. Garrett's deposition transcript as evidence. (*See* 1/29/21 McFarland Decl. (Dkt. # 54) ¶ 2, Ex. A; 2/22/21 Estok Decl. (Dkt. # 68) ¶ 5, Ex. 4; 4/5/21 McFarland Decl. (Dkt. # 88) ¶ 6, Ex. E; Ward Decl. (Dkt. # 90) ¶ 2, Ex. 1.) The court refers to the deposition transcript generally as "Garrett Dep."

[3] Similarly, all parties submit portions of Mr. Dodge's deposition transcript. (*See* 11/20/20 Estok Decl. (Dkt. # 43) ¶ 3, Ex. 1; McFarland Decl. (Dkt. # 37) ¶ 2, Ex. A; 1/29/21 McFarland Decl. ¶¶ 5-6, Exs. D-E; 2/22/21 Estok Decl. ¶ 7, Ex. 6.) The court refers to the deposition transcript generally as "Dodge Dep."

Mr. Dodge, slated to teach science that year, reported to the cultural sensitivity training. (Dodge Dep. at 49:18-24, 71:15-17.) He wore his MAGA hat from the parking lot to the front doors of the school, where he took the hat off and brought it with him to the training. (*Id.* at 74:1-14, 76:20-25, 80:25-81:2.) During the training, Mr. Dodge did not wear the hat but had it visible on his table. (Dodge Dep. at 89:8-2. 90:24-91:3; Garrett Dep. at 121:22-122:2; 1/29/21 McFarland Decl. ¶ 4, Ex. C ("Gomes Dep.") at 115:22-25.[4]) He did not have any negative encounters with anyone about the hat during the training. (Dodge Dep. at 92:15-93:7; *see* Garrett Dep. at 114:11-13.)

After the training, Dr. Rakha and teachers communicated concerns about Mr. Dodge's MAGA hat to Ms. Garrett. (Garrett Dep. at 113:10-25, 118:9-15.) Dr. Rakha approached Ms. Garrett immediately and conveyed that she was "intimidated," "didn't feel safe," and that having the MAGA hat at a cultural competence training felt "like a slap in the face." (*Id.* at 113:17-114:7; Prihoda Decl. (Dkt. # 76) ¶¶ 4, 7; *see* 2/22/21 Estok Decl. ¶ 20, Ex. 19 ("Final Hoff Rep.") at 17.) Teachers also "expressed shock" and being upset about the hat for both personal and professional reasons. (Prihoda Decl. ¶¶ 7-8; *see* 1/29/21 McFarland Decl. ¶ 3, Ex. B ("Matsumoto Dep.") at 41:6-23[5] (describing MAGA hat as "threatening"); Final Hoff Rep. at 11.) Teachers who were minorities or immigrants felt "Mr. Dodge's hat really hit close to home," causing fear,

---

[4] Again, all parties rely on Ms. Gomes's deposition transcript. (*See* 2/22/21 Estok Decl. ¶ 2, Ex. 1; Garrett 2d MSJ at 8 (relying on Ms. Gomes's deposition).) The court refers to the deposition transcript generally as "Gomes Dep."

[5] Mr. Dodge also submits portions of Ms. Matsumoto's deposition transcript. (2/22/21 Estok Decl. ¶ 8, Ex. 7.) The court refers to this document as "Matsumoto Dep."

confusion and sadness.  (Prihoda Decl. ¶ 9; *see* Matsumoto Dep. at 43:1-4, 44:5-9.)  They

also felt "concerned about how the students or their families would feel if they saw Mr.

Dodge wearing the hat"; one teacher who worked with migrant families knew some of

those families viewed "the MAGA slogan as a symbol of intolerance."  (Prihoda Decl.

¶ 9; Matsumoto Dep. at 41:11-23.)  Other teachers shared these similar concerns.

(Thompson Decl. (Dkt. # 75) ¶ 2; Hettman Decl. (Dkt. # 78) ¶ 2; Wilding Decl. (Dkt.

# 77) ¶ 4 (feeling "angry, frustrated and worried" for students from immigrant families

who may view "the hat as a symbol of intolerance, which is absolutely contrary to the

welcoming and inclusive atmosphere [Wy'East] attempted to foster").)

     Upon hearing the concerns, Ms. Garrett worried whether "a faculty member

wearing or displaying the hat would promote a lack of trust in the school . . . and create

an atmosphere of fear and vulnerability for students and/or their family."  (Garrett Decl.

¶ 6.)  Specifically, she knew that in the past summer, there were "frequent news reports

of Spanish-speaking students . . . being separated from their parents, deported, and/or

incarcerated in cages."  (*Id.* ¶ 7.)  Thus, "[e]nsuring an atmosphere of safety and

acceptance" was "of particular import," and she worried that "Mr. Dodge's MAGA hat, if

observed by ELL students and/or their parents, would alienate and jeopardize [their]

feelings of safety and inclusion," which would be "the antithesis of the safe learning

environment the school was trying to create."  (*Id.* ¶¶ 6-8.)

     Ms. Garrett consulted with Ms. Gomes, then Chief Human Resources Officer for

EPS, on how to proceed.  (Garrett Dep. at 123:25-124:6; Gomes Dep. at 107:20-24;

Gomes Decl. ¶ 4; Garrett Decl. ¶ 9.)  Ms. Garrett shared that staff had communicated

their discomfort over Mr. Dodge's MAGA hat.  (Gomes Dep. at 108:3-6, 109:16-110:2; Garrett Dep. at 124:13-17; Gomes Decl. ¶ 4.)  Ms. Gomes asked whether the hat was "causing a disruption to the training," to which Ms. Garrett responded, "Yes."  (Gomes Dep. at 108:17-20.)  Ms. Gomes recommended that Ms. Garrett talk with Mr. Dodge about how his hat made other staff "uncomfortable."  (*Id.* at 108:22-109:19; Garrett Dep. at 125:3-11; Gomes Decl. ¶ 4.)  They did not discuss whether Mr. Dodge could wear his MAGA hat.  (Gomes Dep. at 111:21-112:5; Garrett Dep. at 125:12-14.)

Ms. Garrett spoke with Mr. Dodge that afternoon.  (Garrett Dep. at 122:9-17; Dodge Dep. at 96:5-21.)  After a "cordial" discussion about how the hat may be offensive, she shared that although she "won't tell [him] that [he] can't wear the hat," she advised him to "use [his] better judgment."  (Dodge Dep. at 98:12-99:11.)  Mr. Dodge understood that to mean he should not wear a MAGA hat at Wy'East.  (*Id.* at 99:20-100:7.)  Ms. Garrett believed this agreement "not only safeguard[ed] the interests of [Wy'East] and its students, but also OSPI's objectives of ensuring the ELL students . . . achieved greater success."  (Garrett Decl. ¶ 8.)  After the conversation, Ms. Garrett let Ms. Gomes know that the conversation had gone well and that there was a "mutual understanding" about the hat.  (Garrett Dep. at 126:4-7; Gomes Dep. at 112:6-9, 115:6-116:5; *see* Gomes Decl. ¶ 4.)

2. August 23, 2019

The next day, on Friday, August 23, 2019, Mr. Dodge attended a staff training session at Evergreen High School.  (Dodge Dep. at 115:10-116:9.)  He again wore the MAGA hat in the parking lot, took the hat off upon entering the building, and carried it

with him into the training.  (*Id.* at 116:6-9, 117:6-9, 124:8-16.)  He did not interact with anyone about the hat.  (*Id.* at 116:6-117:5, 121:22-122:3.)  However, teachers from Wy'East again saw his hat, and a group of teachers discussed how Mr. Dodge's hat "caused disruption and concern among EPS staff"; one teacher notified Ms. Garrett that Mr. Dodge had again brought the hat to a training and about the teachers' concerns.  (Wilding Decl. ¶ 3; Prihoda Decl. ¶ 9; Matsumoto Dep. at 51:14-24, 52:12-16, 53:9-14; Garrett Dep. at 134:13-25.)  Ms. Garrett reported feeling "upset that [Mr. Dodge] was being insubordinate" and had again upset his colleagues.  (Garrett Dep. at 140:12-19.)

Ms. Garrett again consulted with Ms. Gomes on how to proceed.  (*See* Gomes Dep. at 112:17-22; Garrett Dep. at 136:12-23, 139:15-19; Gomes Decl. ¶ 5.)  Ms. Garrett informed Ms. Gomes that staff contacted her regarding Mr. Dodge's MAGA hat a second time.  (Gomes Dep. at 112:19-22.)  Ms. Gomes described the conversation as follows:

> [T]he premise for me was, "Was it being a disruption to the school?" whatever was occurring.  It didn't matter what the situation was.  It was just "Is it disrupting?"  That was the form of our conversation and where I kept my questions directed towards.

(*Id.* at 114:12-16.)  Ms. Gomes recommended another conversation to set a "clear directive" about "not having the hat in the training where it was causing the disruption to staff."  (*Id.* at 118:7-14; *see also* Gomes Decl. ¶ 5.)

Ms. Garrett had this second conversation with Mr. Dodge that afternoon, which Mr. Dodge characterized as an "aggressive attack."  (*See* Dodge Dep. at 131:3-6.)  According to Mr. Dodge, Ms. Garrett asked him "[w]hat is the fucking deal with your hat" and said, "I thought we had an agreement about you and your hat."  (*Id.* at 136:7-8;

137:22-23.)  When he responded that he "didn't wear the hat today," Ms. Garrett got "more and more frustrated," calling him a "bigot," a "racist," a "homophobe," a "liar," and a "hateful person."  (*Id.* at 136:11-15, 138:5-15.)  These comments "especially bother[ed] [him]" because even though he "lived in Mexico for two years[] and . . . [spoke] fluent Spanish," Ms. Garrett insinuated that "the Hispanic kids at Wy'East are not going to like [him] because of that hat."  (*Id.* at 140:2-7.)  She then told Mr. Dodge that she did not want him to wear the MAGA hat, and "[t]he next time [she] see[s] [him] with that hat, [he] need[s] to have [his] union rep."  (*Id.* at 141:5-7; 147:23-24.)

Mr. Dodge emailed Ms. Garrett about the incident later on Friday, sharing that he felt "sick to [his] stomach."  (2/22/21 Estok Decl. ¶ 10, Ex. 9 at 4.)  He felt he had "no assurances or protections that [he] will be treated fairly."  (*Id.*)  Ms. Garrett responded over the weekend, noting their discussions about how "colleagues felt intimated, scared, and worried" and how "if kids and parents saw [him] wearing that hat, they might also have similar feelings."  (*Id.* at 1.)  She reiterated that she "was speaking to [him] about the hat because of the impact on the work environment for [his] colleagues, and [her] concern about the potential impact on the learning environment for [the] students."  (*Id.* at 2.)  Ms. Garrett forwarded the message to Ms. Gomes, who replied, "Excellent response!"  (*Id.* at 1.)  Ms. Gomes later explained that her approval was of Ms. Garrett's "professionalism."  (Gomes Dep. at 129:12-130:7; Gomes Decl. ¶ 7.)

### 3. Mr. Dodge's Complaint and Ensuing Investigation

After the incident, Mr. Dodge experienced worsening symptoms that lingered from a stroke he had suffered a year before.  (Dodge Dep. at 173:24-25, 181:8-21;

2/22/21 Estok Decl. ¶ 12, Ex. 11 ("Nicacio Dep.") at 81:5-13, 95:2-5.)  The next week, on August 27, 2019, Mr. Dodge filed a HIB complaint with the District against Ms. Garrett.  (Dodge Dep. at 180:1-5.)  After a day of no response, Mr. Dodge began questioning "does anybody care?" and doubting whether he could adequately teach due to his increased stuttering, difficulty walking, inability to focus, and other symptoms of a panic attack.  (*Id.* at 176:10-15, 177:18-21, 180:1-9, 181:8-21.)  He took that half-day off and has been on leave since then.  (*Id.* at 178:11-13; Gomes Decl. ¶¶ 9, 17-18.)

After receiving Mr. Dodge's HIB complaint, the District began its own investigation.  (Gomes Decl. ¶ 11; Gomes Dep. at 144:11-17, 146:3-18.)  Ms. Gomes oversaw the process.  (Gomes Decl. ¶ 11; Gomes Dep. at 147:6-11.)  Doing so "was consistent with routine and common practice within EPS Human Resources," namely that Ms. Gomes handles complaints involving an administrator.  (Gomes Decl. ¶ 11; Gomes Dep. at 147:12-22.)  Ms. Gomes would ultimately make the determination on Mr. Dodge's HIB complaint, but because the complaint involved an administrator, the District hired a third-party organization, Clear Risk Solutions ("CRS"), to conduct an independent investigation.  (Gomes Decl. ¶¶ 13, 15-16; Gomes Dep. at 151:1-8; *see* 2/22/21 Estok Decl. ¶ 20, Ex. 19 ("Final Hoff Rep.").)

Mr. Chad Hoff from CRS conducted the investigation and reported that Ms. Gomes was his point of contact and sat in on staff interviews.  (2/22/21 Estok Decl. ¶ 17, Ex. 16 ("Hoff Dep.") at 77:9-14; Gomes Decl. ¶ 13 ("It is my standard operating procedure to sit in on HR-directed investigations").)  Mr. Hoff did not have any concern that Ms. Gomes was biased.  (Hoff Dep. at 78:16-18, 81:17-21.)  Mr. Hoff interviewed

Wy'East staff members, several of whom expressed discomfort at seeing Mr. Dodge's MAGA hat.  (Final Hoff Rep. at 8, 11, 14, 17.)  Mr. Hoff confirmed that "Ms. Garrett spoke to Mr. Dodge . . . after multiple staff members voiced their concerns."  (*Id.* at 17.)

While the HIB complaint was pending, Ms. Gomes received a public records request regarding Mr. Dodge from a local newspaper.  (Gomes Decl. ¶ 19; Gomes Dep. at 193:21-25; Dodge Dep. at 289:15-17.)  Ms. Gomes believed that the District would need to produce all of Mr. Dodge's information, including his private medical information.  (Gomes Decl. ¶ 21.)  She informed Mr. Dodge and explained that if he withdrew the HIB complaint, they could continue the investigation without having to turn over his medical information.[6]  (*Id.*; Gomes Dep. 194:1-8, 196:5-23; Dodge Dep. at 289:24-290:4.)  After consideration, Mr. Dodge thanked Ms. Gomes for her "concern for [his] well being" but reiterated his intent to proceed with the HIB complaint.  (Dodge Dep. at 291:15-20; 11/30/20 Dodge Decl. (Dkt. # 44) ¶ 6, Ex. 1 at 1; Gomes Decl. ¶ 23.)

Mr. Hoff completed an initial draft of his investigation report in which he concluded that "Mr. Dodge was singled out because he wore a [MAGA] hat" and that he was "denied his freedom of expression."  (2/22/21 Estok Decl. ¶ 6, Ex. 5 ("Draft Hoff Rep."); Hoff Dep. at 121:23-122:11.)  Mr. Hoff also concluded that Mr. Dodge "kept to himself at the training, sat in the back of the room, and did not provoke or engage people about his beliefs or politics."  (Draft Hoff Rep. at 17.)  However, Mr. Hoff concluded that

//

---

[6] Ms. Gomes now understands that even if Mr. Dodge had rescinded his HIB complaint, the records would still have to be produced, but she attests that her "honest belief" at the time was that the public disclosure could be avoided.  (Gomes Decl. ¶ 21.)

Ms. Garrett did not violate the District's discrimination or HIB policies. (Draft Hoff Rep. at 18; Hoff Dep. at 131:22-134:2 (concluding that two conversations "did not rise to the level" of bullying or harassment).)

Ms. Gomes took issue with two findings in the draft report. First, she felt the conclusion that Mr. Dodge was "singled out" due to his MAGA hat was factually inaccurate; from the staff interviews, she knew that Ms. Garrett discussed the issue "because of staff concerns, not because he was wearing the hat." (Gomes Decl. ¶ 25; Gomes Dep. at 186:6-23 (qualifying conversations as having "nothing to do with the hat" and "everything to do with causing disruption from staff").) Second, she felt Mr. Hoff's conclusion regarding Mr. Dodge's "freedom of expression" was outside the scope of the investigation, which was about whether Ms. Garrett violated District policies. (Gomes Decl. ¶ 25; Gomes Dep. at 189:11-15, 190:10-11, 191:19-192:2.) She recommended that these two findings be removed. (Gomes Decl. ¶ 25.) Mr. Hoff's final report did not include those two findings. (*See* Final Hoff Rep.)

On October 1, 2019, after reviewing Mr. Hoff's final report, Ms. Gomes notified Mr. Dodge of the District's decision. (*See* Gomes Decl. ¶ 28; 2/22/21 Estok Decl. ¶ 22, Ex. 21 ("Dist. Decision") at 1.) The District adopted Mr. Hoff's findings that "multiple staff members voiced their concerns and feelings of being uncomfortable . . . training because [he] wore a [MAGA] hat." (Dist. Decision at 2.) It also adopted the finding that Ms. Garrett did not violate any District policy or procedure. (*Id.* at 2-3.) Nonetheless, the District agreed to honor Mr. Dodge's request to transfer from Wy'East and to educate all employees on freedom of speech, and gave its assurance of no retaliation. (*Id.* at 3.)

Per EPS standard procedure, Ms. Gomes summarized Mr. Hoff's report rather than providing Mr. Dodge a full copy. (Gomes Decl. ¶ 29.)

4. Mr. Dodge's Appeal to the School Board

Mr. Dodge appealed the District's decision to the EPS school board on October 30, 2019. (2/19/21 Dodge Decl. (Dkt. # 69) ¶ 4, Ex. 30.) He also inquired about filing a "separate complaint against the [D]istrict," for an unfair investigation. (*Id.* at 1.) Lastly, he filed a public records request for all documents regarding his complaint, including the CRS report. (*Id.*) Pursuant to EPS policy and state law, the District notified individuals who were in the CRS report to provide them the opportunity to object. (Gomes Decl. ¶ 37.) While waiting for consent, the District provided Mr. Dodge "an abridged version of [the] report" that did not contain the interviews. (*Id.*; 2/19/21 Dodge Decl. ¶ 5.) The District did not receive consent, and thus was unable to provide Mr. Dodge a complete copy of the report until after the hearing. (Gomes Decl. ¶ 37; 2/19/21 Dodge Decl. ¶ 5.)

The school board held an appeal hearing on November 14, 2019. (2/22/21 Estok Decl. ¶ 23, Ex. 22 ("Bocanegra Dep.") at 13:10-12.) The school board considered whether Ms. Garrett had violated District policies, and although Mr. Dodge did not file a separate complaint regarding the District's investigation, the board was informed that Mr. Dodge was concerned about the investigation. (*Id.* at 25:23-26:8; Gomes Decl. ¶ 42.) The school board also reviewed Mr. Dodge's request for extended paid leave. (2/22/21 Estok Decl. ¶ 25, Ex. 24 ("Appeal Decision") at 2.) Ms. Gomes represented the District, and Mr. Dodge, Ms. Garrett, and Ms. Gomes all spoke. (Bocanegra Dep. at 29:4-20; 11/24/20 Dodge Decl. ¶ 8; 2/22/21 Estok Decl. ¶ 24, Ex. 23; Gomes Decl. ¶ 41.)

The school board upheld the District's decision in two letters sent separately to Mr. Dodge and Ms. Garrett. (*See* Appeal Decision.) In the letter to Mr. Dodge, the school board states that "[a]fter careful review of the written materials presented and both parties' presentations," it did not find any violations of the policies or procedure. (*Id.* at 2.) It also found that no violations occurred during the investigation process. (*Id.*) In the letter to Ms. Garrett, the school board repeats its conclusions that there were no policy or process violations. (*Id.* at 1.) But it additionally noted that "[a]side from the above findings," it needed "further information" because of remaining questions " about whether [Ms. Garrett] conducted [herself] in an appropriate or professional manner." (*Id.*) It notified Ms. Garrett that it would request "an administrator to further investigate [her] interactions" so that the school board could review her performance. (*Id.*)

After further investigation, the school board remained concerned about Ms. Garrett's professionalism, as well as some unrelated parent complaints about her performance. (Gomes Decl. ¶ 43; 2/22/21 Estok Decl. ¶ 28, Ex. 27.) Thus, the school board gave Ms. Garrett the option of working at Wy'East until the end of the year and quitting, or accepting some form of discipline that would demote her to an associate principal position. (2/22/21 Estok Decl. ¶ 28, Ex. 27 at 2; Garrett Dep. at 48:1-15.) Ms. Garrett chose to resign and no longer works within EPS. (Garrett Dep. at 45:4-5.)

5. Mr. Dodge's Leave and Benefits Administration

Ms. Gomes also worked with Mr. Dodge on coordinating his leave benefits throughout this process. Mr. Dodge had suffered a stroke in October 2017, which caused him to go on extended medical leave. (2/19/21 Dodge Decl. ¶ 2.) While the District

investigated Mr. Dodge's HIB complaint, the District placed him on paid administrative leave starting September 3, 2019, as was standard procedure.  (Gomes Decl. ¶ 10.)  The District issued its decision on October 1, 2019, and per District policy, Mr. Dodge was to be removed from paid administrative leave at that time.  (*Id.* ¶ 33.)  Ms. Gomes contacted Mr. Dodge the next day to discuss whether he would be returning to work or seeking medical leave, in which case he would need a physician's note.  (*Id.*)  Because he did not yet have a physician's note but had an upcoming appointment on October 25, Ms. Gomes extended his paid administrative leave to October 28, 2019.  (*Id.* ¶ 35.)

During a meeting on October 28, 2019, Ms. Gomes again asked Mr. Dodge for the physician's note, but he did not have it.  (*Id.* ¶ 36.)  Instead, he asked for the paid administrative leave to extend through the appeal hearing.  (*Id.*; 2/19/21 Dodge Decl. ¶ 7.)  The next day, Ms. Gomes notified Mr. Dodge that his paid administrative leave would be ending and reminded him again to submit a doctor's certification.  (Gomes Decl. ¶ 38; 2/19/21 Dodge Decl. ¶ 7(a).)  Mr. Dodge included the issue of his paid administrative leave in his appeal.  (*See* Appeal Decision at 2.)  The school board found:

> [T]he District had been generous in allowing [Mr. Dodge] to remain on district paid leave for an extra month after the investigation . . . to obtain the necessary medical documentation.  When the documentation was never received, the District did not violate any of [his] rights when providing notice that [he] would be removed from district paid leave.

(*Id.*)

On November 11, 2019, Mr. Dodge submitted paperwork, including a physician note, for leave under the Family Medical Leave Act ("FMLA").  (Gomes Decl. ¶ 39.)  The District assisted Mr. Dodge with his short-term disability, long-term disability, and

FMLA applications. (Gomes Decl. ¶¶ 49-51.) As his paid medical leave neared its end

date in the beginning of 2020, another dispute arose over whether Mr. Dodge had unpaid

medical leave remaining under his collective bargaining agreement ("CBA"). Mr.

Dodge's "complex leave history" complicated the matter, as he had already taken leave

previously. (Gomes Dep. at 215:1-14; *see* Gomes Decl. ¶¶ 44-45; 2/19/21 Dodge Decl.

¶ 7.) Near the end of January 2020, Ms. Gomes notified Mr. Dodge that because he had

exhausted his unpaid leave, he had to decide whether he would be returning to work or

not. (Gomes Decl. ¶ 52; 2/19/21 Dodge Decl. ¶ 7(b).) Mr. Dodge insisted that he still

had an additional year of unpaid leave left under his CBA. (Dodge Decl. ¶ 7(b).)

The parties continued to discuss the issue over several months, including exploring

donated sick leave; securing medical releases; whether Mr. Dodge was permanently

disabled according to his physician; and further accounting of the unpaid leave he had

already taken. (Gomes Decl. ¶¶ 53-59; 2/19/21 Dodge Decl. ¶¶ 7(b)-(c).) Mr. Dodge

ultimately filed a grievance under the CBA over the accounting, which was denied.

(Gomes Decl. ¶ 60; 2/19/21 Dodge Decl. ¶ 7(d).) Nonetheless, "to further accommodate

and support Mr. Dodge," EPS extended his unpaid medical leave to February 2021.

(Gomes Decl. ¶¶ 45, 61; Gomes Dep. at 215:21-25.) Mr. Dodge denies being notified of

his leave being extended. (2/19/21 Dodge Decl. ¶ 7(d).)

**B.     Procedural Background**

Mr. Dodge brought suit on March 11, 2020, asserting claims under 42 U.S.C.

§§ 1985 and 1986; First Amendment retaliation and due process claims under § 1983;

claims for violations of the Washington State Constitution; and claims for violations of

RCW 41.06.250.  (*See* Compl. (Dkt. # 1).)  He also sought to recover for defamation and outrage.  (*See id.*)  Defendants moved to dismiss all but the outrage claim.  (*See* MTD (Dkt. # 19) at 2.)  The court dismissed Mr. Dodge's § 1985, § 1986, state constitution, RCW 41.06.250 and defamation claims with prejudice, and his due process claim with leave to amend.  (7/30/20 Order (Dkt. # 24) at 5-13.)

Mr. Dodge filed an amended complaint with three claims:  (1) § 1983 First Amendment retaliation; (2) § 1983 substantive due process violation; and (3) outrage.  (*See* Am. Compl.)  Defendants moved for summary judgment on all claims.  (Dist. MSJ (Dkt. # 36); Garrett MSJ (Dkt. # 39).)  The court granted summary judgment to Defendants on the due process and outrage claims but upheld the First Amendment claim.  (1/13/21 Order at 26.)  On January 29, 2021, Defendants moved for summary judgment on the remaining claim.  (Dist. 2d MSJ at 1; Garrett 2d MSJ at 1.)  Defendants additionally moved for summary judgment on damages, contending that Mr. Dodge had failed to produce any computation of damages or identify any expert to testify to his medical treatment.  (Damages MSJ at 1-2.)  Mr. Dodge filed his motion for partial summary judgment on March 16, 2021 (Dodge MSJ), and finally, Defendants moved to exclude the testimonies of three witnesses as untimely disclosed.  (MTE at 1.)

### III.    ANALYSIS

Summary judgment is appropriate if the evidence shows "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a); *see Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *Galen v. Cnty. of L.A.*, 477 F.3d 652, 658 (9th Cir. 2007).  A fact is "material" if it might affect the

outcome of the case. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A factual dispute is "'genuine' only if there is sufficient evidence for a reasonable fact finder to find for the non-moving party." *Far Out Prods., Inc. v. Oskar*, 247 F.3d 986, 992 (9th Cir. 2001) (citing *Anderson*, 477 U.S. at 248-49).

The moving party bears the initial burden of showing there is no genuine dispute of material fact and that it is entitled to prevail as a matter of law. *Celotex*, 477 U.S. at 323. If the moving party does not bear the ultimate burden of persuasion at trial, it can show the absence of such a dispute in two ways: (1) by producing evidence negating an essential element of the nonmoving party's case, or (2) by showing that the nonmoving party lacks evidence of an essential element of its claim or defense. *Nissan Fire & Marine Ins. Co. v. Fritz Cos.*, 210 F.3d 1099, 1106 (9th Cir. 2000). If the moving party meets its burden of production, the burden then shifts to the nonmoving party to identify specific facts from which a fact finder could reasonably find in the nonmoving party's favor. *Celotex*, 477 U.S. at 324; *Anderson*, 477 U.S. at 252.

The court is "required to view the facts and draw reasonable inferences in the light most favorable to the [nonmoving] party." *Scott v. Harris*, 550 U.S. 372, 378 (2007). The court may not weigh evidence or make credibility determinations because those are "jury functions, not those of a judge." *Anderson*, 477 U.S. at 249-50. Nevertheless, the nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts . . . . Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial." *Scott*,

//

550 U.S. at 380 (internal quotation marks omitted) (quoting *Matsushita Elec. Indus. Co.*
*v. Zenith Radio Corp.*, 475 U.S. 574, 586-87 (1986)).

To establish a prima facie case of retaliation under the First Amendment, a
plaintiff must first show that (1) he engaged in protected speech; (2) the defendants took
an adverse employment action against him; and (3) that his speech was a substantial or
motivating factor for the adverse employment action. *See Thomas v. City of Beaverton*,
379 F.3d 802, 807-08 (9th Cir. 2004). If the plaintiff can establish a prima facie claim,
the burden shifts to the employer to demonstrate either that (1) under the balancing test
established in *Pickering v. Board of Education*, 391 U.S. 563 (1968), the employer's
legitimate administrative interests outweigh the employee's First Amendment rights; or
(2) the employer would have reached the same decision even in the absence of the
employee's protected conduct. *Thomas*, 379 F.3d at 808.

Defendants challenge facets of Mr. Dodge's prima facie case and argue that the
*Pickering* balancing test favors them. (Garrett 2d MSJ at 11-17; Dist. 2d MSJ at 6-13.)
They also contend that Ms. Garrett and Ms. Gomes are entitled to qualified immunity
(Garrett 2d MSJ at 17-19; Dist. 2d MSJ at 13-16), and that EPS is not liable under *Monell
v. Department of Social Servs.*, 436 U.S. 658 (1978), (Dist. 2d MSJ at 17-20). The court
agrees that qualified immunity shields both individual defendants and that *Monell*
liability has not been established as a matter of law. It reviews each defendant in turn.

**A.      Ms. Garrett**

Qualified immunity "protects government officials from liability for civil damages
unless their conduct violates 'clearly established statutory or constitutional rights of

which a reasonable person would have known.'" *Horton by Horton v. City of Santa Maria*, 915 F.3d 592, 599 (9th Cir. 2019) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)); *see also Ziglar v. Abbasi*, 137 S. Ct. 1843, 1866 (2017) ("Government officials are entitled to qualified immunity with respect to 'discretionary functions' performed in their official capacities."). The doctrine gives officials "breathing room to make reasonable but mistaken judgment about open legal questions." *Ashcroft v. al-Kidd*, 563 U.S. 731, 743 (2011). Qualified immunity protects "all but the plainly incompetent or those who knowingly violate the law." *Malley v. Briggs*, 475 U.S. 335, 341 (1986). Accordingly, plaintiffs bringing § 1983 claims against individual officers must demonstrate that (1) a federal right has been violated and (2) the right was clearly established at the time of violation. *Pearson v. Callahan*, 555 U.S. 223, 232 (2009). The court may address the two prongs in any order and, assuming without deciding that Mr. Dodge's First Amendment rights were violated, it begins with the clearly established prong. *See id.* at 236.

A clearly established right is one that is "sufficiently clear that every reasonable official would have understood that what he is doing violates that right." *Isayeva v. Sacramento Sheriff's Dep't*, 872 F.3d 938, 946 (9th Cir. 2017); *see Ziglar*, 137 S. Ct. at 1867. Courts must not "view constitutional rights in the abstract but rather 'in a more particularized, and hence more relevant, sense.'" *Brewster v. Bd. of Edu. of Lynwood Unified Sch. Dist.*, 149 F.3d 971, 977 (9th Cir. 1998) (quoting *Anderson v. Creighton*, 483 U.S. 635, 640 (1987)). Courts look "not to constitutional guarantees themselves" but to "the various doctrinal tests and standards that have been developed to implement and

to administer those guarantees." *Id.*  Although it is not necessary to identify a case "precisely like this one," *Eng v. Cooley*, 552 F.3d 1062, 1076 (9th Cir. 2009), there must be "some parallel or comparable factual pattern" to establish that the contours of the right were clearly established, *Clairmont v. Sound Mental Health*, 632 F.3d 1091, 1109 (9th Cir. 2011).  Thus, plaintiffs "generally 'must identify a case where an officer acting under similar circumstances as [plaintiff] was held to have violated [that right]." *Shafer v. Cnty. of Santa Barbara*, 868 F.3d 1110, 1117 (9th Cir. 2017).

In the First Amendment retaliation context, the Ninth Circuit has acknowledged that the *Pickering* balance is "difficult" to strike, as it "requires particularized balancing on the unique facts presented in each case." *Brewster*, 149 F.3d at 979; *see Moran v. Washington*, 147 F.3d 839, 847 (9th Cir. 1998).  Because the *Pickering* inquiry "requires a fact-sensitive, context-specific balancing of competing interests," "public-employee free speech claims will 'rarely, if ever, be sufficiently clearly established to preclude qualified immunity." *Brewster*, 149 F.3d at 980 (quoting *Moran*, 147 F.3d at 847).  The facts presented here, however, may constitute "one of those rare instances" in which *Pickering* rights are clearly established.  *See id.*  Thus, the court must determine whether, given the available case law in August 2019, a reasonable principal, knowing what Ms. Garrett knew, would have understood that asking Mr. Dodge to not wear his MAGA hat at school was unconstitutional.  Put differently, the court must decide whether the outcome of the *Pickering* balance so clearly favored Mr. Dodge that it would have been "patently unreasonable for [Ms. Garrett] to conclude that the First Amendment did not protect his speech." *See id.*  The court now reviews the relevant legal landscape.

At the outset, courts have consistently emphasized "the need for affirming the comprehensive authority . . . of school officials, consistent with fundamental constitutional safeguards, to prescribe and control conduct in the schools." *Tinker v. Des Moines Indep. Cmty. Sch. Dist.*, 393 U.S. 503, 507 (1969). While teachers undoubtedly do not "shed their constitutional rights to freedom of speech or expression at the schoolhouse gate," *id.* at 506, courts have also acknowledged that "[t]he determination of what manner of speech in the classroom or in school assembly is inappropriate properly rests with the school board, rather than with the federal courts," *Hazelwood Sch. Dist. v. Kuhlmeier*, 484 U.S. 260, 267 (1988) (quoting *Bethel Sch. Dist. No. 403 v. Fraser*, 478 U.S. 675, 683 (1986)) (internal citation and quotation marks omitted); *see also Weingarten v. Bd. of Edu. of City Sch. Dist. of City of N.Y.*, 591 F. Supp. 2d 511, 519-20 (S.D.N.Y. 2008) ("*Weingarten I*") (deferring to expertise of school officials to "understand the needs, capabilities and vulnerabilities of [the student] population").

Pursuant to these principles, some courts have approved of regulations that control whether teachers can don political materials at school. In *Weingarten v. Board of Education of City School District of New York*, 680 F. Supp. 2d 595 (S.D.N.Y. 2010) ("*Weingarten II*"), the court considered the constitutionality of a regulation prohibiting teachers from wearing political campaign buttons.[7] *Id.* at 596. *Weingarten II* upheld the ban partly due to the school's belief that "[d]isplays of political partisanship by teachers in the schools . . . are inconsistent with [the] educational mission." *Id.* at 601. Similarly,

---

[7] In *Weingarten I*, the court denied plaintiffs' motion for a preliminary injunction on this issue because it held that they were unlikely to prevail on the merits. 591 F. Supp. 2d at 515-20.

in *California Teachers Association v. Governing Board of San Diego Unified School District*, 53 Cal. Rptr. 2d 474 (Cal. Ct. App. 1996), the court rejected a First Amendment challenge to a similar ban, holding that "school authorities retain the power to dissociate themselves from political controversy by prohibiting their employees from engaging in political advocacy in instructional settings." *Id.* at 480. Neither of these cases involved First Amendment retaliation, but the court recognizes them as relevant to the legal background informing a reasonable school administrator's understanding of the lawfulness of regulating political expression.

The *Pickering* balancing test here further complicates a reasonable administrator's understanding.[8] In *Brewster*, the Ninth Circuit recognized both the teacher's interest in speaking out on a matter of public concern and the school's considerations of disruption, including intra-school disharmony, the degradation of the teacher-principal relationship, the interference with the teacher's duties, and the ultimate falsity of the teacher's allegations. 149 F.3d at 980-81. The court also found it "significant" that the teacher's speech "was not directed to the public or the media." *Id.* at 981. Because "both parties [could] point to important interests supporting their respective sides of the *Pickering* balance," and the relevant case law did not lead "inexorably to a single conclusion," the court concluded that "it would . . . be dubious indeed to conclude that [the teacher's] right to speak was sufficiently 'clearly established' to defeat the school officials' assertion of

//

---

[8] Again, the court assumes without deciding that Mr. Dodge's allegations constitute speech on a matter of public concern and thus are within the ambit of the First Amendment. *See Brewster*, 149 F.3d at 979.

qualified immunity." *Id.* Since *Brewster*, the Ninth Circuit has reached the same conclusion when the *Pickering* balance "does not provide clear-cut results." *See, e.g.*, *Lytle v. Wondrash*, 182 F.3d 1083, 1089 (9th Cir. 1999). Other cases addressing a school's "strong and recognized interest in maintaining its political neutrality as an educational institution" have found that the school's interests outweigh the teacher's First Amendment interests. *See, e.g.*, *Hudson v. Craven*, 403 F.3d 691, 700-01 (9th Cir. 2005).

As in *Brewster* and *Lytle*, applying the *Pickering* test here provides no clear-cut results. The court acknowledges, of course, that Mr. Dodge has a right to political speech that is generally "entitled to the fullest possible measure of constitutional protection." *See Members of City Council of L.A. v. Taxpayers for Vincent*, 466 U.S. 789, 816 (1984); *see also Brewster*, 149 F.3d at 980 (emphasizing that teacher's interest in "speaking out on a matter of public concern cannot be gainsaid"). The court also recognizes that Mr. Dodge's speech was not ultimately found to be false, as was the case in *Brewster*. *See* 149 F.3d at 981.

But several considerations weigh in favor of Ms. Garrett. First, "courts have found it significant when employee expression disrupts harmony among co-workers." *Brewster*, 149 F.3d at 980; *see Clairmont*, 632 F.3d at 1107 (examining "disruption resulting both from the act of speaking and from the content of the speech"). In *Brewster*, a single co-worker's testimony that the speech was "hurtful" and led to distrust indicated intra-school disharmony. *Id.* Here, several people at Wy'East were "intimidated," "shock[ed]," "upset," "angry," "scared," "frustrated," and "didn't feel safe" upon learning of Mr. Dodge's MAGA hat, and staff reported that "the hat caused

disruption and concern among EPS instructors and staff."[9]  (Prihoda Decl. ¶ 9; Wilding

Decl. ¶¶ 3-4; Matsumoto Dep. at 43:1-4, 44:5-9; Garrett Decl. ¶ 5; Garrett Dep. at

113:17-114:7; Final Hoff Rep. at 17); *see Clairmont*, 632 F.3d at 1107 (considering

whether speech occurred at workplace).  Mr. Dodge insists there was no "actual, material

and substantial disruption."[10]  (2d MSJ Resp. at 26.)  The court disagrees.  Although

disruptions may not have occurred in front of Mr. Dodge, the disharmony caused by his

hat—whether he wore it or displayed it on his table—is undisputed in the record.  And

even if these complaints did not rise to an "actual, material and substantial disruption,"

they provide support for "reasonable predictions of disruption."  *See Robinson v. York*,

566 F.3d 817, 824 (9th Cir. 2009) (recognizing both avenues in *Pickering* balancing).

The evidence here goes beyond what was deemed "a relevant consideration" in *Brewster*

and thus similarly warrants consideration.  *See* 149 F.3d at 980-81.

     Second, whether an employee's speech interferes with his duties is also relevant.

*Hyland v. Wonder*, 972 F.2d 1129, 1139 (9th Cir. 1992).  Here, Ms. Garrett was

//

---

[9] At oral argument, Mr. Dodge argued that the teacher declarations should be stricken because they were filed with Defendants' reply.  Mr. Dodge did not file a notice of intent to file a surreply or a surreply.  (*See* Dkt.); Local Rules W.D. Wash. LCR 7(g).  Moreover, the court has discretion to consider new evidence on reply, particularly if the new evidence "appears to be a reasonable response to the opposition."  *Hodges v. Hertz Corp.*, 351 F. Supp. 3d 1227, 1249 (N.D. Cal. 2018).  The court exercises its discretion and considers the evidence filed with Defendants' replies because it responds to Mr. Dodge's arguments and is consistent with the argument and evidence presented in the moving papers.

[10] Mr. Dodge questions the credibility of District witnesses and argues that Ms. Garrett's reasons are pretextual but submits insufficient evidence to raise a genuine issue of material fact.  *See British Airways Bd. v. Boeing Co.*, 585 F.2d 946, 952 (9th Cir. 1978) ("[L]egal memoranda and oral argument are not evidence, and they cannot by themselves create a factual dispute sufficient to defeat a summary judgment motion where no dispute otherwise exists.").

concerned that Mr. Dodge's hat would erode "trust in the school" amongst staff, students and their families at a time when "[e]nsuring an atmosphere of safety and acceptance" was of "particular import" because of the OSPI's mandate and current events. (Garrett Decl. ¶¶ 7-8.) Her concerns were echoed by several teachers and the trainer on cultural sensitivity. (*Id.* ¶ 5; Garrett Dep. at 113:17-114:7; Prihoda Decl. ¶ 9; Matsumoto Dep. at 41:11-23; Thompson Decl. ¶ 2; Hettman Decl. ¶ 2; Wilding Decl. ¶ 4.) These worries, from multiple educators with experience developing relationships with students, support that the predictions of disruption were reasonable, not imaginary. *See Robinson*, 566 F.3d at 826. Courts have remarked on a school's "strong and recognized interest in maintaining its political neutrality as an educational institution." *Hudson*, 403 F.3d at 700; *see also Hazelwood*, 484 U.S. at 272. Thus, this factor—the impact of Mr. Dodge's MAGA hat on the operations of a school—also weighs in favor of Ms. Garrett.

Additional factors also tip the balance towards Ms. Garrett. Courts have recognized that the principal-teacher relationship is one where "a wide degree of deference to the employer's judgment is appropriate." *Brewster*, 149 F.3d at 980 (quoting *Connick*, 461 U.S. at 151-52) (internal quotation marks omitted). Speech that erodes such "a close working relationship premised on personal loyalty and confidentiality" or "impairs discipline or control by superiors" may increase the employer's interest in preserving the efficiency of the workplace. *Hyland*, 972 F.2d at 1139. Here, evidence supports that Ms. Garrett believes that Mr. Dodge was "insubordinate" when he brought his hat again on August 23 after their first conversation. (Garrett Dep. at 140:12-19); *see Moran*, 147 F.3d at 850 ("The First Amendment simply

does *not* constitutionalize insubordination.").  And lastly, it's significant that Mr.

Dodge's speech "was not directed to the public or the media," as the "limited audience

weigh against his claim of protected speech."  *See Roe v. City and Cnty. of S.F.*, 109 F.3d

578, 585 (9th Cir. 1997); *Brewster*, 149 F.3d at 981.

The court emphasizes that it is not ruling on the merits of whose interests prevail

under the *Pickering* balancing test, nor is it determining whether Mr. Dodge's speech was

protected by the First Amendment.  Instead, it is faced with the "much simpler task" of

determining whether the legal landscape is so clear, or the outcome of the *Pickering* test

so clearly favors Mr. Dodge, that Ms. Garrett could not have reasonably believed that the

school's interest in promoting an inclusive learning environment for all students and

avoiding disruption were sufficient to justify her two conversations with Mr. Dodge.  *See*

*Brewster*, 149 F.3d at 981.  Neither case law nor the *Pickering* test as applied here

support such a conclusion.  Thus, Mr. Dodge's right to wear his MAGA hat was not so

"clearly established" as to defeat Ms. Garrett's assertion of qualified immunity.

In his response, Mr. Dodge insists that "a public-school employee's right to have a

political badge on campus" was clearly established by August 2019.  (2d MSJ Resp. at

32.)  But this characterization of the right at issue is the type of generalized proposition

that the Supreme Court has prohibited.[11]  *See Ashcroft*, 563 U.S. at 742.  Mr. Dodge's

framing does not account for the circumstances Ms. Garrett was facing, nor does it

//

---

[11] Even if Mr. Dodge's framing is at the right level of specificity, it is unclear whether it was clearly established that a school could not control a teacher's ability to have a political badge on campus, as discussed earlier.  *See, e.g.*, *Weingarten II*, 680 F. Supp. 2d at 601.

recognize any of the balancing factors under *Pickering*. *See Shafer*, 868 F.3d at 1117; *Moran*, 147 F.3d at 845. Tellingly, he cites no analogous case where the protected speech involved a political badge; where the speech triggered several complaints from colleagues; or where school administrators received concerns of how the speech would negatively impair the workplace. (*See* 2d MSJ Resp. at 32-33.) Indeed, he cites no case occurring in an educational setting at all. (*See id.*) At oral argument, he conceded that he was not aware of any authority considering similar circumstances. Although Mr. Dodge need not identify a case with "closely analogous" facts, he is required to provide preexisting authority with "some parallel or comparable factual pattern." *See Clairmont*, 632 F.3d at 1109. All his cases involve First Amendment retaliation claims, but Mr. Dodge provides no further support for how they are comparable to the circumstances here and in turn, fails to show how his authority would have made clear to a reasonable school administrator in Ms. Garrett's position that her actions were unlawful.

In short, Mr. Dodge has not carried his burden of establishing that his right to wear his MAGA hat to school was so "clearly established" that Ms. Garrett, or any reasonable school administrator, could not have "reasonably believed" that the school's interests in promoting the education of all students were sufficient to justify the two conversations on August 22 and 23. *See Moran*, 147 F.3d at 850. Accordingly, the court concludes that Ms. Garrett is entitled to qualified immunity on Mr. Dodge's First Amendment claim.

**B.    Ms. Gomes**

Ms. Gomes also argues that she is shielded from liability by qualified immunity for Mr. Dodge's allegations about the part she played in advising Ms. Garrett and

managing Mr. Dodge's subsequent HIB complaint and administration of leave benefits. (Dist. 2d MSJ at 13-16.) The court's analysis of qualified immunity and the complex *Pickering* balancing here applies with equal weight to Ms. Gomes's guidance that Ms. Garrett set a clear directive to Mr. Dodge about not wearing his MAGA hat at school. *See supra* § III.A. As with Ms. Garrett, the record evinces that Ms. Gomes was notified of a disruption during the trainings and that staff complained of feeling uncomfortable and fearful. (Gomes Dep. at 108:17-20, 114:12-16, 118:7-14; Gomes Decl. ¶¶ 4-5.) As a result, she instructed Ms. Garrett to address the hat because it was causing a disruption. (*See id.*) Mr. Dodge has not shown that given these circumstances, the *Pickering* balance so clearly favored him that it would have been "patently unreasonable" for Ms. Gomes to have advised Ms. Garrett as such. *See Brewster*, 149 F.3d at 980. Nor has Mr. Dodge presented any case law establishing that a reasonable official would have understood Ms. Gomes's subsequent actions in these circumstances—her management of the HIB investigation, handling of the public records request, or accounting of Mr. Dodge's remaining leave—were unconstitutional. Accordingly, the court concludes that Ms. Gomes is entitled to qualified immunity.

Even if qualified immunity did not extend to Ms. Gomes's actions after August 23, 2019, Mr. Dodge has failed to establish that his MAGA hat was a "substantial or motivating factor" driving Ms. Gomes's subsequent actions. A plaintiff can establish that retaliation was a substantial or motivating factor in various ways through circumstantial evidence. *See McCollum v. Cal. Dep't of Corrs. and Rehabilitation*, 647 F.3d 870, 882 (9th Cir. 2011). However, Mr. Dodge presents no such evidence. In his response, he

purports that there is "ample evidence" of causation but then cites none as support. (*See* 2d MSJ Resp. at 31-32); *see United States v. Dunkel*, 927 F.2d 955, 956 (7th Cir. 1991) ("Judges are not like pigs, hunting for truffles buried in briefs."). Similarly, in his motion for partial summary judgment, he focuses only on Ms. Gomes's actions on August 22 and 23—nothing afterwards. (Dodge MSJ at 11.) At oral argument, when asked for evidence of retaliatory motive, he cited only the alleged retaliatory acts. The court's own review of the record reveals only evidence that Ms. Gomes followed standard district policies. (*See, e.g.*, Gomes Dep. at 147:12-22; Gomes Decl.); *see Wood v. Yordy*, 753 F.3d 899, 904-05 (9th Cir. 2014) (finding no evidence of any link to protected speech). Although Mr. Dodge now argues that Ms. Gomes's actions amount to a "campaign of harassment," he neither points to any evidence disputing Ms. Gomes's stated reasoning nor produces evidence connecting Ms. Gomes's actions to his MAGA hat.[12] (*See* 2d MSJ Resp. at 31-32); *see McCollum*, 647 F.3d at 882-83 (requiring evidence, not just argument, to raise issue of fact for retaliatory motive).

In sum, the court finds that Ms. Gomes is entitled to qualified immunity. Furthermore, even if qualified immunity does not extend to Ms. Gomes's actions after August 23, Mr. Dodge has not established a retaliatory motive for those actions.

//

---

[12] Mr. Dodge notes that *Coszalter v. City of Salem* recognized "proximity in time and pretextual explanations" as circumstantial evidence that support causation. (2d MSJ Resp. at 31-32 (citing *Coszalter*, 320 F.3d 968, 977 (9th Cir. 2003)).) The court agrees with this general statement of the law. But Mr. Dodge does not then identify any evidence of pretext or that the temporal proximity here is sufficient. (*See id.*); *see Bleeker v. Johans*, No. CV-07-0413-PCT-SMM, 2009 WL 10673562, at *6 (D. Ariz. Sept. 1, 2009) (noting that one to four-month period is insufficient to establish a nexus based on temporal proximity alone).

Accordingly, the court grants summary judgment to Ms. Gomes on Mr. Dodge's First Amendment retaliation claim.

## C.    EPS

Lastly, EPS argues that Mr. Dodge cannot establish municipal liability for the underlying alleged violations.  (Dist. 2d MSJ at 17-20.)  Under *Monell v. Department of Social Services of New York*, 436 U.S. 658 (1978), a government entity may not be held liable under § 1983 unless a "policy or custom" of the entity can be shown to be a moving force behind the alleged constitutional violation.  *See id.* at 694.  A plaintiff may establish *Monell* liability in three ways:  (1) the entity's implementation of its official policies or established customs inflicted the constitutional injury; (2) acts of omission, such as the failure to train or supervise, amount to an official policy; or (3) an official with final policymaking power ratified a subordinate's unconstitutional decision or action and the basis for it.  *Clouthier v. Cnty. of Contra Costa*, 591 F.3d 1232, 1249-50 (9th Cir. 2018), *overruled on other grounds by Castro v. Cnty. of L.A.*, 833 F.3d 1060 (9th Cir. 2016).  Mr. Dodge argues only for the third avenue of *Monell* liability:  that the EPS school board ratified Ms. Garrett and Ms. Gomes's unconstitutional actions by affirming the denial of his HIB complaint.  (*See* 2d MSJ Resp. at 34-35.)

Ratification exists when "an official with final policymaking authority ratified a subordinate's unconstitutional decision or action and the basis for it."  *Gillette v. Delmore*, 979 F.2d 1342, 1347-48 (9th Cir. 1992).  Ratification necessarily requires knowledge of an unconstitutional act, but "knowledge . . . does not, by itself, constitute ratification."  *Christie v. Iopa*, 176 F.3d 1231, 1239 (9th Cir. 1999).  A policymaker's

"mere refusal to overrule a subordinate's completed act does not constitute approval." *Id.*
Moreover, failure to discipline alone is insufficient to establish ratification. *Id.* Lastly, to
show that ratification was a "moving force" behind the constitutional deprivation, a
plaintiff must demonstrate both causation in fact and proximate causation. *Dougherty v.
City of Covina*, 654 F.3d 892, 900 (9th Cir. 2011); *Arnold v. Int'l Bus. Mach. Corp.*, 637
F.2d 1350, 1355 (9th Cir. 1981). EPS does not contest that the school board has final
policymaking power; instead, it argues that Mr. Dodge cannot establish ratification or
causation. (Dist. 2d MSJ at 19.) The court agrees.[13]

First, it is not at all clear that the school board approved of the directive to not
wear the MAGA hat such that they "ratified . . . [the] unconstitutional decision . . . and
the basis for it." *See Gillette*, 979 F.2d at 1347-48. After all, Ms. Garrett's directive to
not wear the hat, Ms. Gomes's guidance, and whether those actions violated Mr. Dodge's
free speech rights were not the subject of the HIB complaint. (*See* Gomes Decl. ¶ 25;
Gomes Dep. at 189:11-15, 190:10-11, 191:19-192:2; Dist. Decision at 2-3.) Instead, the
school board reviewed whether there were "any violations of [District] policies or
procedure," including discrimination, harassment, bullying, intimidation, or civility
norms. (Appeal Decision at 2.) Thus, this is unlike other ratification cases where a
subsequent investigation was about the very constitutional violation or retaliation at issue.
*See Fuller v. City of Oakland*, 47 F.3d 1522, 1526 (9th Cir. 1995) (finding ratification

---

[13] At the outset, the court notes that because Mr. Dodge failed to establish that his
protected speech was a substantial factor in Ms. Gomes's actions after August 23, 2019, *see
supra* § III.B, any portion of Mr. Dodge's *Monell* claim that relies on those actions must fail as
well, *see Quintanilla v. City of Downey*, 84 F.3d 353, 355 (9th Cir. 1996).

when complaint alleging excessive force was investigated and investigation was approved by police chief).  Mr. Dodge provides no explanation and cites no authority for why this limited scope of the appeal equates to a ratification "that [Mr.] Dodge's freedom of speech rights would not be recognized going forward."[14]  (2d MSJ Resp. at 34.)

But even if the school board had ratified the alleged First Amendment violations, Mr. Dodge offers no argument on how the school board's appeal decision was a but-for or proximate cause of his injury—indeed, he does not mention causation at all.  (*See id.* at 34-35.)  Indeed, when asked at oral argument where he addressed *Monell* causation in his briefing, he pointed only to his reply pertaining to the individual defendants, which did not address *Monell* liability.  Mr. Dodge does not explain how his injury "would not have occurred" but for the school board's appeal decision.  *See Smith v. Harrington*, No. C 12-03533 LB, 2015 WL 1407292, at *25 (N.D. Cal. Mar. 27, 2015).  As for proximate cause, Mr. Dodge does not provide evidence of a "sufficient causal link" between the school board's appeal decision and his injury, or how his injury was a foreseeable risk of the appeal decision.  *See id.*  Causation is all the more critical here, where the school board's review was not directly related to whether Mr. Dodge could wear his MAGA hat.

//

---

[14] Indeed, the school board's subsequent actions further undercut ratification, as they investigated Ms. Garrett's conduct under concerns of professionalism.  (Appeal Letter at 1.)  Eventually, the school board's concerns about her professionalism led, in part, to Ms. Garrett's exit from the District.  (2/22/21 Estok Decl. ¶ 28, Ex. 27 at 2; Garrett Dep. at 45:4-5, 48:1-15.)  At oral argument, Mr. Dodge contended that if the school board had shared its subsequent actions against Ms. Garrett with him, then the school board would not have ratified the unconstitutional behavior.  But Mr. Dodge does not explain how or why ratification hinges on what information is shared with him.

*See Van Ort v. Est. of Stanewich*, 92 F.3d 831, 837 (9th Cir. 1996) ("Without proximate cause, there is no section 1983 liability.").

Because Mr. Dodge has not raised a genuine issue of material fact regarding the school board's *Monell* liability, the court grants summary judgment to EPS on Mr. Dodge's First Amendment retaliation claim.

## IV.    CONCLUSION

For the foregoing reasons, the court GRANTS the District's motion for summary judgment (Dkt. # 53) and Ms. Garrett's motion for summary judgment (Dkt. # 56). The court DENIES the remaining motions (Dkt. ## 64, 82, 83) as moot.

Dated this 3rd day of May, 2021.

_____
JAMES L. ROBART
United States District Judge